1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4   SERENA FLEITES, et al.,        ) Case No. LA CV 21-04920-WLH-
                                    )                         ADS
5              Plaintiffs,          ) Related Cases:
                                    ) LA CV 24-05190-WLH-ADS
6   vs.                             ) LA CV 24-04800-WLH-ADS
                                    ) LA CV 24-05185-WLH-ADS
7   MINDGEEK S.A.R.L., et al.,      ) LA CV 24-04977-WLH-ADS
                                    ) LA CV 24-04998-WLH-ADS
8              Defendants.          ) LA CV 24-04801-WLH-ADS
    _____ ) LA CV 24-05026-WLH-ADS
9                                     LA CV 24-07046-WLH-ADS
                                      LA CV 24-04971-WLH-ADS
10                                    LA CV 24-04795-WLH-ADS
                                      LA CV 24-04992-WLH-ADS
11                                    LA CV 24-04791-WLH-ADS
                                      LA CV 24-04788-WLH-ADS
12                                    LA CV 24-04786-WLH-ADS

13                                    Los Angeles, California

14                                    Thursday, April 24, 2025

15                                    (9:10 a.m. to 10:55 a.m.)
                                      (1:43 p.m. to 2:29 p.m.)
16                                    (2:50 p.m. to 3:52 p.m.)

17      TRANSCRIPT OF HEARING ON DEFENDANTS' MOTION TO DISMISS
               BEFORE THE HONORABLE WESLEY L. HSU
18                UNITED STATES DISTRICT JUDGE

19  Appearances:                    See next page.

20  Court Reporter:                 Recorded; CourtSmart

21  Courtroom Deputy:               Holidae Crawford

22  Transcribed by:                 L. Caldwell
                                     Echo Reporting, Inc.
23                                   9711 Cactus Street, Suite B
                                     Lakeside, California 92040
24                                   (858) 453-7590

25  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

2

```
 1  APPEARANCES:

 2  For the Plaintiffs:          MICHAEL J. BOWE, ESQ.
                                 LAUREN TABAKSBLAT, ESQ.
 3                               Brown Rudnick LLP
                                 Seven Times Square
 4                               New York, New York 10036
                                 (212) 209-4800
 5
                                 DAVID M. STEIN, ESQ.
 6                               NANCY M. OLSON, ESQ.
                                 Olson Stein LLP
 7                               240 Nice Lane
                                 Unit 301
 8                               Newport Beach, California
                                  92663
 9                               (949) 887-4600

10  For the Defendants:          JAMES M. PEARL, ESQ.
                                 KIAURA CLARK, ESQ.
11                               Paul Hastings LLP
                                 1999 Avenue of the Stars
12                               Suite 2700
                                 Los Angeles, California 90067
13                               (310) 620-5700

14                               KEVIN C. ADAM, ESQ.
                                 White and Case LLP
15                               75 State Street
                                 Boston, Massachusetts 02109
16                               (617) 979-9321

17                               DAVID G. HILLE, ESQ.
                                 White and Case LLP
18                               1221 Avenue of the Americas
                                 New York, New York 10020
19                               (212) 819-8357

20                               ANDREW S. TULUMELLO, ESQ.
                                 JOSH WESNESKI, ESQ.
21                               Weil Gotshal and Manges LLP
                                 2001 M Street, Northwest
22                               Suite 600
                                 Washington, DC 20036
23                               (202) 682-7000

24

25
```

*Echo Reporting, Inc.*

3

```
1   APPEARANCES:   (Cont'd.)

2   For Defendants:              CHRISTINA HOLLANDER, ESQ.
                                 Visa Inc.
3                                Post Office Box 8999
                                 San Francisco, California
4                                  94128

5                                ARAMEH Z. O'BOYLE, ESQ.
                                 ESTEBAN MORALES FABILA, ESQ.
6                                Mintz Levin Cohn Ferris
                                   Glovsky and Popeo P.C.
7                                2049 Century Park East
                                 Suite 300
8                                Los Angeles, California 90067
                                 (310) 226-7846
9
                                 LISAMARIE F. COLLINS, ESQ.
10                               Mintz Levin Cohn Ferris
                                   Glovsky and Popeo P.C.
11                               919 Third Avenue
                                 New York, New York 10022
12                               (212) 935-3000

13                               JONATHAN S. SACK, ESQ.
                                 Morvillo Abramowitz Grand
14                                 Iason and Anello P.C.
                                 565 Fifth Avenue
15                               New York, New York 10017
                                 (212) 880-9410
16
                                 RONALD G. WHITE, ESQ.
17                               Walden Macht Haran and
                                   Williams LLP
18                               250 Vesey Street
                                 Twenty-Seventh Floor
19                               New York, New York 10281
                                 (212) 335-2030
20
                                 MATTHEW V. POVOLNY, ESQ.
21                               Cohen and Gresser LLP
                                 800 Third Avenue
22                               New York, New York 10022
                                 (212) 957-7561
23

24

25
```

4

1  APPEARANCES:  (Cont'd.)

2  For Defendants:              KERIME S. AKOGLU, ESQ.
                                Mintz Levin Cohn Ferris
3                                 Glovsky and Popeo, P.C.
                                919 Third Avenue
4                                Thirty-Ninth Floor
                                New York, New York 10022
5                                (212) 935-3000

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1   <u>Los Angeles, California; Thursday, April 24, 2025 9:10 A.M.</u>

2                          --o0o--

3                      (Call to Order)

4           THE CLERK:  Calling the MindGeek cases,

5   LA 24-CV-5190, LA 24-CV-4800, LA 24-CV-5185, LA 24-CV-4977,

6   LA 24-CV-4998, LA 24-CV-4801, LA 24-CV-5026, LA 24-CV-7046,

7   LA 24-CV-4971, LA 24-CV-4795, LA 24-CV-4992, LA 24-CV-4791,

8   LA 24-CV-4788, LA 24-CV-4786, LA 21-CV-4920.

9           Counsel, please state appearances, starting with

10  the Plaintiff.

11          MR. BOWE:  Good morning, your Honor.  Michael Bowe

12  from -- and Lauren Tabaksblat -- from Brown Rudnick, David

13  Stein and Nancy Olson from Olson Stein, for the Plaintiffs.

14          THE COURT:  Good morning.

15          MR. STEIN:  Good morning, your Honor.

16          MS. OLSON:  Good morning.

17          MS. TABAKSBLAT:  Good morning, your Honor.

18          MR. PEARL:  Good morning, your Honor.  Bo Pearl on

19  behalf of the Redwood Defendants, and I'm joined by my

20  colleague, Kiaura Clark.

21          THE COURT:  Good morning.

22          MS. CLARK:  Good morning.

23          MR. ADAM:  Good morning, your Honor.  Kevin Adam

24  from White and Case on behalf of the Colbeck Defendants, and

25  I'm joined here by David Hille.

6

1          MR. HILLE:  Good morning.

2          THE COURT:  Good morning.

3          MR. TULUMELLO:  And good morning, your Honor.

4  Drew Tulumello from Weil, Gotshal and Manges, with my

5  colleague, Josh Wesneski, and Christina Hollander, the

6  deputy general counsel of Visa.

7          MS. O'BOYLE:  Good morning, your Honor.  Arameh

8  O'Boyle of Mintz on behalf of the MindGeek Defendants.  I'm

9  joined today by my colleagues, Lisa Marie Collins and

10  Esteban Morales.

11          THE COURT:  All right.  Thank you all.

12          MR. SACK:  Good morning.  Jonathan Sack with the

13  Morvillo Abramowitz firm on behalf of David Tassillo.

14          MR. WHITE:  Your Honor, good morning.  Ronald

15  White from Walden, Macht and Haran on behalf of Defendant

16  Mr. Bergmair.

17          MR. POVOLNY:  Good morning, your Honor.  Matthew

18  Povolny from Cohen and Gresser on behalf of Feras Antoon.

19          THE COURT:  All right.  I think that's everyone.

20          THE CLERK:  Counsel on Zoom, please make your

21  appearance.

22          MS. AKOGLU:  Good morning, your Honor.  This is

23  Kerime Akoglu on behalf of MindGeek.

24          THE COURT:  Okay.  All right.  The matter is

25  calendar for various motions to dismiss.  I was unable to

7

1 complete all of the tentatives for this morning, but we

2 issued some tentatives this morning.  Has everyone had a

3 chance to review -- if you received a tentative, have you

4 had a chance to review it?

5          MR. POVOLNY:  Yes, your Honor.

6          THE COURT:  I'm seeing nodding.  Okay.  I thought

7 that it might make sense to start the hearing -- by the way,

8 I have a hard stop at 11:00.  So, if we're not done by

9 11:00 -- I hope to be done by 11:00, but, if we're not done

10 by 11:00, we're going to have to resume later in the

11 afternoon, like at -- more like at 1:30 or 2:00.  But I hope

12 to be done by 11:00.

13          But I thought we ended the last hearing in the

14 midst of Visa's argument, and so I don't know if it makes

15 sense to just let you finish.  I don't know how much more

16 you had, but now you have the tentative, so you can see

17 where I'm going -- but let you finish.  I think I owed,

18 then, the Redwood Defendants the opportunity to speak, and

19 then the individual Defendants, although maybe the

20 individual Defendants don't need to be heard any further,

21 but -- in light of the tentative.

22          But why don't we do that, and we'll see how far we

23 progress.

24          UNIDENTIFIED SPEAKER:  Your Honor, if I just can

25 clarify, the Colbeck Defendants also need a chance.

8

1          THE COURT:  Yes.  Okay.

2          MR. PEARL:  Yes, your Honor.  We can go right

3  after the Redwood Defendants.

4          THE COURT:  Okay.  Perfect.

5          MR. TULUMELLO:  Good morning.  Thank you, your

6  Honor.  Drew Tulumello from Weil Gotshal for Visa.

7          I'm going to shift my remarks to account for the

8  tentative, and try to get right to the heart of the matter,

9  of what -- where we thought the previous opinion went wrong

10 as to the conspiracy allegations under the TVPRA, which

11 essentially is that knowledge kind of did the work, or was

12 sufficient for the other two remaining crucial Halberstam

13 elements of conspiracy, which is the actual agreement and

14 the intent to aid, and that case after case against service

15 providers like banks and others make clear that routine

16 transactions, providing typical services, not doing anything

17 above and beyond your regular commercial activity, is not

18 sufficient to support an inference at the pleading stage

19 that those other two elements under Halberstam for

20 conspiracy have been satisfied.

21         And that's -- and so allowing knowledge to

22 substitute for the intent element and the agreement element,

23 we believe, was the fundamental error there, and, quickly

24 digesting the tentative, we think that the approach in the

25 tentative follows the law correctly, and this is also

9

1  buttressed by the concern that general knowledge awareness

2  and acquiescence, in and of itself, is not sufficient,

3  typically, to establish those second two elements under

4  Halberstam, and that's, you know, we submit, what we have

5  here.

6           Looking at the allegations as to Visa, they are

7  all in the domain of knowledge, notice, should have known,

8  NGOs, newspaper articles, PayPal, and so forth, but there

9  are no allegations that would support the inference on the

10  agreement or the intent to aid, and we think that that

11  ruling in the tentative is consistent with the common-law

12  boundary that Twitter was trying to emphasize between

13  passive, almost, you know, bystander nonfeasance, versus

14  actively associating oneself with the conspiracy in a way

15  that is truly culpable.

16           And the same types of arguments made against Visa

17  here, allegations, you know, to my mind, reflect almost

18  identically the allegations against the social media

19  platforms, Twitter and Google and Facebook, in that case,

20  not a TVPRA case, but the allegations, nonetheless, were

21  that, you know, ISIS was a designated terrorist

22  organization.  It was using the platforms to recruit, raise

23  money, grow, succeed, and so forth.

24           The platforms knew about it.  They knew about it.

25  The platforms also made money from the ads that got placed

10

1    on the ISIS videos, and I think the Court unanimously,

2    reversing the Ninth Circuit, made clear that, in effect,

3    that was not enough, because establishing the platform,

4    engaging in routine commercial transactions, just like you

5    would with anyone else, doesn't give rise to the type of

6    culpability that supports secondary liability.

7              So we think that that boundary is important to

8    recognize in its careful application of the second two

9    Halberstam elements that help police that boundary, and we

10   think, in the tentative, the analysis is correct, and, you

11   know, do not have much more to elaborate on that.  I would

12   just say I think the Court's ruling is consistent with all

13   of the cases we are aware of that look at buyer-seller

14   transactions, banks, credit cards, and their potential

15   secondary liability.

16             In all of those cases, what the courts essentially

17   ask, at a minimum, is "Was this something beyond the routine

18   provision of commercial services with knowledge?"  And in --

19   Salesforce (phonetic) cites Dart (phonetic), a case

20   involving credit card companies, Deutsche Bank, which also

21   found participation on it, but doesn't find conspiracy

22   liability, and in a variety of the other cases that we've

23   cited, there must be something more, and we don't believe

24   anywhere in the complaint that they have alleged the added

25   "more."

11

1          You know, they did, in the briefing, take us to

2  task on one point, in saying that we -- that Visa sort of

3  ignores the issue of it doing due diligence, and, you know,

4  referring to paragraph 289.  We don't -- even if they -- if

5  that allegation does apply to Visa, Visa isn't mentioned in

6  that paragraph.  It's the banks and financial institutions.

7  But, again, that would just be based -- that would just be

8  the acquisition of knowledge.  It's -- you know, there's

9  just, again, coming back to my point, no plus factors, no

10 affirmative conduct, nothing different.

11          So, your Honor, we otherwise would submit on the

12 tentative, and happy to let, you know, colleagues, either on

13 the defense or Plaintiffs' side, but that was the thrust of,

14 you know, what I wanted to emphasize here, was that I do

15 think the tentative correctly accounts for critical other

16 two elements in Halberstam, and is consistent with the cases

17 about routine provision of commercial services as set forth

18 in Twitter and several other cases.

19          THE COURT:  All right.  Thank you.

20          MR. TULUMELLO:  Thank you.

21          THE COURT:  I'll note before we move to Redwood,

22 et cetera, the reason that I had Ms. Crawford send you a

23 copy of the Visa tentative, is because I thought that that

24 would give you some guidance as to how I'm looking at the

25 hedge funds, as well.  So, hopefully, although it's not

12

1    specific as to you, it is -- I think that they are -- I

2    think it's illustrative of where I'm thinking with respect

3    to your clients as well.

4            So why don't I hear from either --

5            MR. PEARL:  Mr. Bowe want to go and --

6            THE COURT:  No.  He's going to have a lot to

7    respond to, so I think he should go last --

8            MR. PEARL:  Okay.  Great.

9            THE COURT:  -- because he has all of the arguments

10   from the last argument to respond to, also.

11           MR. PEARL:  We have some slides.  I'm going to go

12   through them quickly, because I know your Honor is on a

13   time --

14           THE COURT:  I mean, I just don't want to have all

15   your client paying for you to be here over the lunch hour.

16           MR. PEARL:  No, I understand.  I appreciate that.

17   I will be brief, following up on --

18           THE CLERK:  Is there one for the Court?

19           MR. PEARL:  Yes.

20           THE COURT:  Do you have a second one?  Why don't

21   you give that one to Ms. Silva (phonetic).  Thank you.

22           MR. PEARL:  So, your Honor, we can start on slide

23   two, if you would.

24           THE COURT:  Okay.

25           MR. PEARL:  So, Bo Pearl on behalf of Redwood.

13

1          At the outset, I want to say, you know, Redwood

2    finds the allegations in the complaint very disturbing, and,

3    you know, does not intend at all to minimize what happened

4    here, but I just want to -- I want to touch on the intent

5    and agreement elements that your Honor highlighted in the

6    tentative, and I think, if you look at Twitter, as my

7    colleague from Visa said, Twitter lays out how the Supreme

8    Court thinks about secondary liability for secondary actors

9    like banks.  They say:

10              "Culpability of some sort is necessary

11              to justify punishment of a secondary

12              actor, lest mostly passive actors like

13              banks become liable for all of their

14              customers' crimes by virtue of carrying

15              out routine transactions."

16          And what the Court in Twitter goes on to say is --

17   it looks at Google, where Google actually processed videos

18   of ISIS, and revenue-shared with ISIS members, and the Court

19   found that was not enough to find secondary liability.

20          And here what you have -- and I encourage the

21   Court to look at the loan documents -- this is a standard

22   loan/lender relationship.  These are standard credit

23   documents, and Redwood had no revenue share.  Redwood was

24   not making more money the more web traffic that MindGeek

25   got.  Redwood was paid based on interest rates that are

14

1  defined in the agreement.  So the biggest risk to Redwood is

2  that MindGeek gets shut down and can't pay back the loan.

3  That's the big risk.

4        And so, when you look at what Redwood's intent was

5  in entering these agreements, you look -- and the Plaintiffs

6  talk a lot about due diligence.  If you turn to slide six,

7  what Redwood and the other lenders -- and there were over

8  100 lenders involved in this, including major banks, and I

9  learned as I was going through this, the way that lending

10 works in these syndicates -- and most lending in America

11 right now is done by syndicates -- is there will be 30, 40

12 lenders participating in it, and those lenders don't all do

13 diligence.

14        What they do is they hire international audit

15 firms, international investigation firms, and that's exactly

16 what happened here.  The lenders hired Grant Thornton, which

17 is an international firm, and what did Grant Thornton's due

18 diligence show?  It said, "Every single" -- if you turn to

19 slide seven, it says:

20        "Every single user-uploaded video is

21        reviewed for any of the seven sins, and

22        for general obscenity."

23        Thirty-employee department.  "The company will

24 immediately remove any video flagged by any community

25 member."  It goes on, on slide eight, "Best-in-class

15

1  management in institutional procedures, processes, and

2  compliance."  So Redwood and the over 100 over lenders that

3  entered into this thought that MindGeek had a substantial

4  and best-in-class compliance regime in place, and, in fact,

5  Plaintiffs' court order concedes that every video was

6  manually reviewed.  So the Grant Thornton report was right

7  in that.

8          And then, if you go to the actual lending

9  documents themselves, both the 2013 and 2018 lending

10 documents, they make absolutely clear that Redwood and the

11 other lenders had no intention of sponsoring or entering

12 into some sort of joint venture or conspiracy to promote

13 CSAM.  In fact, the documents, the lending documents,

14 explicitly prohibit this.  If you turn to slide 12, it

15 says -- this is the 2013 agreement, which is at ECF 450-2,

16 Section 6.O1H.  It says:

17          "No loan party or any of its

18          subsidiaries is in violation of any of

19          its governing documents, the DMCA

20          (phonetic), the CDA (phonetic), any 2257

21          law, or any criminal statute."

22          So these were the representations that MindGeek

23 was making to the lenders.  They go on to say that -- on

24 slide 13 -- that they have posted on any site any content

25 containing child pornography, that they maintain staff,

16

1  training, and policies, and MindGeek covenanted that no

2  content on its sites will violate any of the deadly sins

3  under such business risk assessment and mitigation programs,

4  including child pornography, violence, hate, and extreme

5  sexual violence.

6          The covenants go on, again, to say that they will

7  not post any child pornography, and then, when the Kristof

8  article hits in December 2020, the lenders' intent is shown

9  very clearly, when -- and this is at 450-4, and I really

10  encourage the Court to go back and read this.  The lenders

11  send -- have the administrative agent send a letter to

12  MindGeek of a notice of intent to declare default, and what

13  do they require?  They require evidence of compliance with

14  the loan covenants, and, more important, if you turn to page

15  18, the lenders required that MindGeek appoint a monitor to

16  ensure that there was compliance with the loan covenants

17  that had been agreed to in 2013 and 2018.

18          None of these documents that are incorporated by

19  reference into the complaint, without objection, indicate

20  any intent or actions to agree to monetize child

21  pornography, and it's interesting because, if you look at

22  the Plaintiffs' complaint, one of the things they take us to

23  task for is that we didn't require compliance with Section

24  2257, but, if you look at the loan documents, it explicitly

25  requires them to require with Section 2257.  If you look at

17

1  the default letter in 2020, it explicitly requires them to

2  comply with 2257, and, as your Honor knows, I think, from

3  your previous life, 2257 is the record-keeping statute that

4  is intended to prevent child pornography by reviewing the

5  appropriate age verifications.

6       So your Honor got it right in the Visa tentative,

7  in terms of evaluating the intent and agreement, and the

8  Court should look at the 2013 agreement, the 2018 agreement,

9  to, one, see that these are standard loan agreements.

10 They're standard credit documents.  They don't give Redwood

11 any special right.  We're not running their business.  We're

12 loaning them money.  And there's a reason why there is no

13 case that Plaintiffs cite that holds a lender liable in

14 these types of circumstances, where all they failed to do

15 was declare a default because of a constructive or actual

16 knowledge of a loan covenant.  There is no case that puts

17 that requirement on the lender.

18      So, for those reasons, your Honor, we think the

19 conspiracy claim fails as to Redwood, as it does as to Visa,

20 but I'm happy to take questions on the other claims, as

21 well.

22      THE COURT:  I don't have any specific questions.

23      MR. PEARL:  Okay.  With that, I will turn it over

24 to my Colbeck colleagues.

25      THE COURT:  All right.  Thank you very much.

18

1          MR. ADAM:  Good morning, your Honor.  Kevin Adam

2    from White and Case on behalf of the Colbeck Defendants.

3          THE COURT:  Good morning.

4          MR. ADAM:  I'll try to be brief here and not

5    retread things, but I just want to set the stage a bit as to

6    Colbeck.  Colbeck, they're -- it's a lender who, along with

7    dozens of other sophisticated financial institutions, issued

8    loans to MindGeek entities way back in 2011 and 2013, so

9    prior to much of the conduct that's talked about in the

10   complaints, and those loans, the 2011 and 2013 loans, ended,

11   full stop, for Colbeck in 2018, so well before the 2020

12   media blitz and New York Times articles that are referenced

13   throughout the complaint.  So Colbeck doesn't have the

14   opportunity, once that information is out there, to withdraw

15   from any supposed conspiracy.  All right?  They are out in

16   2018.

17         Colbeck is not alleged to have any contact with

18   any direct traffickers or any trafficking venture at all.

19   Colbeck is not alleged to have been involved in any

20   decisions relating to the uploading, treatment, or removal

21   of any videos, and as for the three conspiracy requirements

22   here that we're talking about, knowledge, agreement, and

23   intent, Plaintiffs' claims fall short on all three with

24   respect to Colbeck, and you have a unique situation here,

25   where a third-party lender, who's alleged to be conspiring

19

1  to benefit from sex trafficking, actually has a written

2  express agreement to point to that literally says, as

3  counsel just walked through, that such trafficking is not

4  occurring and will not occur in the future.

5          So, just turning quickly to knowledge, far from

6  knowledge of sex trafficking, the Colbeck loan agreements

7  contain both representations and covenants that this

8  behavior is not happening and will not happen in the future.

9  These terms came after due diligence, right?  So, if they

10 had the due diligence, then they entered into the terms of

11 these loan agreements.  They didn't have knowledge at that

12 time.  They didn't have knowledge moving forward, assuming

13 that MindGeek was complying with the terms of the loan

14 agreements.

15         And, second, Plaintiffs' reply relied heavily on

16 the post-2020 explosion, and how parties reacted to that

17 media coverage.  For example, they point to PayPal

18 withdrawing.  No opportunity for Colbeck to have done that.

19 Colbeck was out in 2018.  So Plaintiffs don't satisfy the

20 knowledge requirement as to Colbeck.

21         Turning to the alleged agreement, Plaintiff

22 concedes that the complaints fail to allege an actual

23 agreement.  They ask the Court instead to infer such --

24         THE COURT:  Can I go back for a second?

25         MR. ADAM:  Sure.

20

1          THE COURT:  Let me just ask -- so it's more

2    theoretical, I believe, but I understand the -- you know,

3    the loan documents are very persuasive.  What is a plaintiff

4    to do in a situation where -- and I'm just talking about

5    knowledge.  I'm not talking about the other elements.

6          What is a plaintiff to do when they suspect the

7    situation is "Yes, they're putting that text in the

8    agreement, but they know, they affirmatively know, what the

9    criminal conduct is that's going on, that it is going on,

10   and that they are just putting the terms in there to -- in

11   an attempt to shield themselves from this lawsuit

12   afterwards"?  What does a plaintiff do in that situation, to

13   overcome that?

14         MR. ADAM:  I think they'd have to point to

15   specific facts to plausibly alleged that Colbeck, in this

16   instance, had that knowledge after the loan agreements.

17   They haven't done so.  There's sort of threadbare mentions

18   of, you know, awareness of a one-off lawsuit that has

19   nothing to do with CSAM, that maybe Colbeck could have found

20   if it searched around online.  There is nothing from 2011,

21   2013, to the exit in 2018, that Plaintiffs allege factually

22   to support those conclusory allegations that we indeed had

23   knowledge.  They would have to allege specific facts, your

24   Honor.

25         THE COURT:  Okay.  All right.  Thank you.

21

1          MR. ADAM:  And just briefly on the agreement.
2  Drawing an inference that there was an agreement here is --
3  you know, that inference would be both unreasonable and
4  obviously contradicted by the terms of the loan agreement.
5  The loan agreement expressly prohibits that conduct, and the
6  allegations here don't even make sense.  Redwood just sort
7  of walked through the financial interests, but, also,
8  there's 40 other sophisticated financial institutions that
9  are signing onto these agreements.  They have access to the
10 same representations, covenants, financial terms of the loan
11 agreements that Plaintiffs are relying on.
12          So all 40 of these sophisticated institutions were
13 in on this conspiracy to include language in the loan
14 agreements that expressly prohibits the illegal conduct they
15 supposedly want to occur, just so that, a decade later, if
16 we need to look back, that that language will be in the
17 agreement?  It's just implausible, your Honor.  So the Court
18 should refuse to infer that there was any sort of agreement
19 between MindGeek and Colbeck to benefit from a
20 sex-trafficking venture.
21          And the same is true for the intent to aid.
22 Stacking unreasonable inference on unreasonable inference,
23 Plaintiffs ask the Court to infer that Colbeck intended to
24 aid MindGeek in violating the TVPRA, but, when you look to
25 the complaint, you know, what they're citing to is Colbeck's

22

1   intention to profit from the interest on its loans, and its

2   generalized claims that MindGeek and Colbeck had a

3   long-running relationship, no action taken by Colbeck, no

4   overt act, to draw an inference from which that we were

5   intending to aid in any way.  There was nothing that Colbeck

6   has done to facilitate that.  So the Court should refuse to

7   infer that Colbeck intended to aid, as well.

8           So, just to wrap up, while what Plaintiffs have

9   alleged here is terrible, the complaints simply don't

10  plausibly allege a conspiracy to violate the TVPRA as to the

11  Colbeck Defendants.  So, again, we are also in line with

12  your Honor's reasoning in the Visa tentative.

13          THE COURT:  Okay.  Thank you.

14          MR. ADAM:  Thank you.

15          THE COURT:  All right.  Would any of the

16  individual Defendants like to be heard?

17          MR. SACK:  I think, your Honor, we obviously fully

18  agree with the tentative ruling, and I think we'll rest on

19  that for now.  We may have some reply if Plaintiffs' counsel

20  speaks to the issues in the tentative.

21          THE CLERK:  Sir, I'll ask you to go to the mic,

22  because we're recording here.  I'm sorry.

23          MR. SACK:  I apologize.

24          Your Honor, Jonathan Sack for David Tassillo.  We

25  agree with your Honor's tentative ruling.  We have nothing

23

1  to add to it at this point.  We reserve the right to reply

2  if Plaintiffs' counsel addresses the tentative ruling.

3          THE COURT:  Okay.  Thank you.

4          Given the posture of the tentative, does MindGeek

5  want to be heard?

6          MS. COLLINS:  Good morning, your Honor.  LisaMarie

7  Collins on behalf of the MindGeek entity Defendants.

8          With respect to the issue of personal

9  jurisdiction, the MindGeek entity Defendants agree with your

10 Honor's tentative and do not wish to be heard at this time.

11         THE COURT:  No, I mean with respect to the

12 MindGeek -- the rest of it.

13         MS. COLLINS:  I'll turn that over to my colleague.

14         THE COURT:  Okay.  Thank you.

15         MS. O'BOYLE:  Thank you, your Honor.  Arameh

16 O'Boyle on behalf of the MindGeek Defendants.

17         If I may, I would like to address, very briefly,

18 because your Honor kindly gave me plenty of time to argue

19 last time, the Section 230 portion of your tentative.

20         THE COURT:  Yes.

21         MS. O'BOYLE:  Thank you so much for providing that

22 tentative to us this morning.  Two main issues that I would

23 like to make as to the tentative on the 230.  The first is,

24 the tentative identifies four, what the Court calls

25 "distinguishing facts" between our case here and the

24

1  WebGroup allegations, and if it's okay with the Court, I've

2  also come with a handout today.

3          THE COURT:  Okay.

4          MS. O'BOYLE:  It's a brief, double-sided handout

5  that highlights some of the allegations of WebGroup that I

6  would just like to point out for the Court, if I may.

7          THE COURT:  You may.  Does Mr. Bowe have a copy?

8          MS. O'BOYLE:  No.

9          Very briefly, your Honor, as to the first point in

10  the tentative regarding the guidelines that promote or

11  encourage sex trafficking, here I would draw the Court's

12  attention to the allegation in paragraph 134 of the WebGroup

13  second amended complaint, which is on the right-hand column

14  of this handout, where it talks about Defendants:

15          "Creating, continuing in the compilation

16          of related search terms, its use of

17          obvious child-focused terms like

18          'toddler,' both encouraging and

19          contributing to illegal conduct."

20          Paragraph 163 of the WebGroup second amended

21  complaint also talks about the Defendants being:

22          "Responsible, in whole or in part, for

23          developing and creating guidelines which

24          permit, promote, and encourage sex

25          trafficking."

25

1          Next, with regards to the tags and the keywords in

2   the WebGroup Defendants -- in the WebGroup Defendant

3   complaint -- there the Court found that those were standard

4   publishing functions, or neutral tools, because they were

5   user-generated.  The same is true here, your Honor.  The

6   fact is that the tags on the MindGeek Defendants' websites

7   were also user-created and selected.  Finally, the Court

8   pointed out that one of the other differences here is that

9   MindGeek is alleged to have scrubbed words and titles, and

10  changed some of the tags and titles and so on.

11          So, again going back to the handout here, the

12  WebGroup second amended complaint is replete with

13  allegations that the Defendants created tags, titles, or key

14  words associated with CSAM, that Defendants reviewed and

15  monitored, and they approved incoming videos, including

16  videos of CSAM, that the Defendants in WebGroup developed or

17  manipulated search terms that they again generated,

18  originated, created, or otherwise edited, tags.

19          And so, with that, your Honor, I would submit that

20  there are allegations in the WebGroup second amended

21  complaint that address the three issues that you highlighted

22  in your tentative of this morning regarding the similarities

23  between our allegations and those.

24          The second main issue that I want to address is

25  something that the Court notes on page 17 of the tentative,

26

1   which is, it quotes from WebGroup's the opinion in WebGroup,

2   this idea that:

3            "The scope of Section 230 immunity

4            presents a difficult and complex issue

5            that requires case-specific and, indeed,

6            claim-specific, analysis."

7            So I want to focus on that here, because our

8   position, your Honor, is that Plaintiff has not -- Plaintiff

9   Fleites is, I believe, the Plaintiff that the tentative is

10  directed to.  Plaintiff Fleites has not sufficiently alleged

11  how MindGeek created to the creation and development of her

12  videos.

13           And an important point I want to make here, your

14  Honor, is that there are no factual allegations in the

15  Fleites complaint, or of the complaints, to support how a

16  human reviewer would have had reason to know, simply by

17  reviewing the video, that that content was CSAM.

18  Plaintiffs' conclusorily declare that, by reviewing it, the

19  human moderator should have known that it's CSAM, but

20  identifying CSAM, your Honor, is much more nuanced than

21  that.

22           Sometimes the subjects of these videos are not

23  even visible on the video.  The only part of a subject that

24  you might see in one of these videos might be a calf, or

25  someone's back.  So, for a lot of reasons, it might be

27

1  difficult for a human moderator viewing the content to

2  ascertain whether that video is depicting a minor or not,

3  and Plaintiffs completely gloss over that critical point in

4  all of the complaints.  They instead simply declare that, by

5  reviewing the video, MindGeek should have known that it was

6  CSAM, but that's not enough, your Honor.  That's an

7  important point that we cannot gloss over.

8          If we focus on Plaintiff Fleites, again,

9  paragraphs 448, 449, there are no allegations as to why the

10  human moderator should have known that that video was CSAM.

11  If we focus on some of the other ones, for example,

12  Plaintiff N.L., you will find the same deficiencies, your

13  Honor.  Plaintiff N.L. is alleged to have been 17 years old

14  when the video was made, so she was a post-pubescent woman,

15  and the title of her video was "Young Stepsister Stripped."

16  There's nothing from that that would have alerted a human

17  moderator at MindGeek that that content was CSAM.

18          THE COURT:  But didn't Plaintiff Fleites -- I

19  don't have the paragraph number at my fingertips, but

20  doesn't Plaintiff Fleites say something to the effect of

21  "It's obvious from the face of my video that I was 13," or

22  "that I was underage"?

23          MS. O'BOYLE:  No, your Honor.  There's -- she does

24  allege that she was 13 years old when the video was made.

25          THE COURT:  Right.

28

1          MS. O'BOYLE:  There are no allegations as to what

2     the content of the video is, whether her face was visible on

3     that video, whether any part of her was actually visible on

4     that video.  Plaintiffs take those for granted, and

5     conclusorily declare they would have known it.

6          THE COURT:  Well, I mean -- I'm sorry.  Well,

7     there was also the title of the video when it was uploaded,

8     that identified her as 13.

9          MS. O'BOYLE:  That is true for Plaintiff Fleites,

10    your Honor.

11         THE COURT:  I'm talking about Plaintiff Fleites at

12    the moment.

13         MS. O'BOYLE:  Yes, the title.  But now, once you

14    go into the other 12 complaints, for example, N.L. or J.C.,

15    you don't have those titles anymore.  So where is the

16    allegation that says that the human moderator should have

17    known that this was CSAM in the first place?  Those

18    allegations are critical in these types of cases, your

19    Honor, and they're missing here, at least in some of the 13

20    cases, and it's something that the Court should really

21    consider in making the ruling as to all of the Plaintiffs.

22         THE COURT:  I see.  Okay.

23         MS. O'BOYLE:  You know, the big point here is, if

24    Plaintiffs are permitted to completely abrogate Section 230

25    immunity based on what I submit to you are nothing more than

29

vague and speculative and unsupported allegations that a

moderator should have known that their content was CSAM just

by looking at it, or if the allegation is that MindGeek did

not do enough, or if Section 230 is going to be simply

thrown to the wayside here because, obviously, sometimes

mistakes were obviously made as part of this robust

monitoring program, then that, your Honor, is contrary to

the exact purpose of Section 230.

        THE COURT:  Yes, but I don't think I'm saying

that.  I don't think I'm even indicating that.  I think

that -- I sort of think the opposite, actually.  I think

that what I'm saying is that Section 230 immunity is robust,

but what it's intended to do is to protect MindGeek in the

instance that its users are conducting malfeasance.  It is

not intended to protect MindGeek from its own malfeasance,

and that is what, you know, arguably, has been alleged here,

is that MindGeek's own employees were engaged in malfeasance

to help the bottom line, and at this stage, I think --

because let me give you an example.

        You say it's a conclusory statement, but, if --

just hypothetically speaking, if the Plaintiff was a toddler

when the movie was shot, I could accept that, to survive

summary -- or, I'm sorry, to survive a motion to dismiss,

that a MindGeek employee reviewed that video and posted it

anyway.  The conclusory allegation that they reviewed the

30

1  video and they posted it anyway would be sufficient to carry

2  the day.  And so I guess the question is, what is the

3  line -- what do you need Mr. Bowe to specifically say in the

4  complaint?  And I think it would be satisfied by a statement

5  on information and belief that anyone viewing the video

6  would have known that Ms. Fleites was underage.

7          Now, I understand it's a different question with

8  respect to, you know, 17-year-old Plaintiffs, but isn't that

9  sufficient to survive, if I give him leave to amend, which I

10 think, in this circumstance, I would, and he comes back and

11 alleges, "Of course the employee could tell, upon reviewing

12 the video, that she was, in fact, 13," or a least

13 under-aged, under 18?

14         MS. O'BOYLE:  So I suppose my answer would be it

15 depends what he comes back with in terms of the allegations

16 in the amended complaint, but, again, there need to be

17 allegations that the human moderator would have reason to

18 know that the subject of the video was a toddler.  Again,

19 perhaps the subject of the video is actually not shown in

20 the video.  Perhaps all we see is a --

21         THE COURT:  I see.

22         MS. O'BOYLE:  -- the back of someone.

23         THE COURT:  Okay.

24         MS. O'BOYLE:  And then, second, and probably my

25 last point on this, your Honor, is the modification that is

31

1 alleged, that MindGeek is alleged to have done on the

2 content at issue, which is really, it seems to be, editing

3 of the tags.

4          THE COURT:  Right.

5          MS. O'BOYLE:  There are, again, no specific

6 allegations that the tags that MindGeek is alleged to have

7 put on the content or edited is anything other than a

8 content-neutral tool.  The videos -- there are no

9 allegations that the MindGeek Defendants edited the tags to

10 include CSAM terms.  So it's entirely unclear how the tag

11 that the MindGeek Defendants are alleged to have added to

12 the content materially contributed to the unlawfulness of

13 each Plaintiffs' video, not just Plaintiff Fleites, either.

14          THE COURT:  Okay.

15          MS. O'BOYLE:  That's all I have to cover on

16 Section 230, unless you have any other questions, your

17 Honor, and I thank your time letting me discuss this with

18 you.

19          THE COURT:  No problem.  Thank you very much.

20          All right.  Mr. Bowe.

21          MR. BOWE:  Ms. Tabaksblat.

22          THE COURT:  Okay.  All right.  Thank you.

23          MS. TABAKSBLAT:  Thank you, your Honor.  So, your

24 Honor, I'll just very briefly, for a minute or two, just

25 address the argument by MindGeek, and then I'll move on to

32

1  the argument with respect to Redwood, Colbeck, and Visa.

2          So we agree with the Court's tentative.  We think

3  the Court did a careful analysis of the WebGroup complaint,

4  and we do agree that the allegations that are cherry-picked

5  here, they evidence one of two things, either a general

6  approach that's taken uniformly with respect to all videos,

7  or a general business model to create tags, which are

8  distinguished, as the Court recognizes, from the very

9  specific allegations of the individualized and personalized

10 review of each and every video, and the optimization and

11 collaboration with respect to each of those videos.  That

12 distinguishes this case from WebGroup.  It also

13 distinguishes it from the whole host of other cases that

14 MindGeek relies on, and we do think the Court reached the

15 correct conclusion here.

16         With respect to the claim about knowledge of the

17 Plaintiff's, the victim's, age, the Court is correct that,

18 with respect to Ms. Fleites, the complaint is very specific,

19 both with respect to the title of the video, the fact that

20 she's 13, as well as the numerous comments that are all pled

21 in the complaint from users that are observing this video,

22 "She doesn't look more than 12," "It's not possible she's

23 more than a child."  All of that is sufficient.

24         We also believe, if the Court will go back and

25 look at the other specific allegations in the 13 additional

33

complaints, that there are similar allegations with respect
to each Plaintiff in those cases, but the Court doesn't need
to reach that to get to those allegations, because both the
Ninth Circuit, in <u>United States v. Spark</u> (phonetic), and --
apologies.  My notes are not so clear, here, but I think
it's the <u>Richeau</u> (phonetic) case.  It's a Northern District
of California 2023 case that we cite in our brief -- imposes
strict liability as to the knowledge of a minor if there's
an opportunity to observe, which is here.

       And so here all the Plaintiffs were minors.  There
is that strict liability, but, in any event, the complaint
pleads --

       THE COURT:  Well, wait.  It's strict liability
with the opportunity to observe?  Is that what you said?

       MS. TABAKSBLAT:  Correct.  So, in this case,
there's an allegation that a human formatter or moderator
viewed every single video, so there's no video that was
posted to this site without actually observing it, and so,
where a child is a minor, that strict liability as to their
knowledge attaches, and in the Northern District of
California --

       THE COURT:  Well, wait.  What about Ms. O'Boyle's
point that, like, not in every video are you going to see
the subject?  Like, what if you only -- I think the example
that she gave, the first example she gave, was you only see

34

1  the victim's calf.  There's still strict liability, in your

2  view?

3          MS. TABAKSBLAT:  Well, there may not -- in that

4  case, there is a question as to whether or not there was an

5  opportunity to observe, but, again, I don't think the cases

6  and the allegations in each particular case involve the

7  observation of a case, as Ms. O'Boyle raised.

8          THE COURT:  Right, but I think her broader point

9  is, because no allegations have been made about the contents

10 of each of these individual videos, you can't trigger that

11 sort of liability, because we don't know what the moderator

12 saw, without the -- absent such an allegation.

13         MS. TABAKSBLAT:  Well, your Honor, I believe what

14 every single one of those complaints allege is that

15 MindGeek's moderators were able to observe, based on the

16 view of Plaintiff, their face in that case, and their

17 observation they were a minor.  Inherent in that is the

18 allegation that they were able to observe their face.  This

19 isn't an -- you know, this isn't a video where there's a

20 calf or a back or a toe.  This is a video where they were

21 readily identifiable.

22         THE COURT:  Okay.

23         MS. TABAKSBLAT:  And that follows, your Honor,

24 from all the allegations about the material impact it's had

25 on their lives, right?  Others understood it was them.

35

1  They -- their -- you know, their -- throughout the school,

2  it was known that it was them.  This wasn't an instance

3  where their toe was present and nobody knew who it was.

4  This was something where it was observable.

5          THE COURT:  Okay.  And that allegation is --

6  something to that effect is alleged in each of the

7  individual complaints?  That's what you're telling me?

8          MS. TABAKSBLAT:  Either an allegation as to the

9  age, an allegation as to the use of the word -- an

10 allegation as to the use of their face, an allegation as to

11 their age in the video or user comments, in every complaint.

12          THE COURT:  Okay.  All right.  Thank you.

13          MS. TABAKSBLAT:  So, turning now to the conspiracy

14 count against Redwood, Visa, and Colbeck, we did have an

15 opportunity to very quickly read your Honor's tentative.  So

16 we'll start with the fact that we're here in a pleading

17 stage, and, as the Court correctly observed in that

18 tentative, is that conspiracy -- is it inherently a factual

19 question?  It could be alleged, and ultimately something to

20 do through circumstantial evidence, and it's rarely

21 something that comes through through direct evidence, and

22 that evidence, as the Court is aware, is often uniquely in

23 the hands of Defendants.  So we're here in that context.

24          The Court also -- and I appreciate that the

25 tentative is only with respect to Visa, but the Court also

36

observed that the knowledge aspect of it -- that their --
that Visa's knowledge with respect to MindGeek's trafficking
activity is sufficiently alleged to sustain a conspiracy
claim, and, your Honor, the Court essentially hinged its
holding here on the Court's finding that that knowledge is
not itself, without more, sufficient to create an inference
of an intent or an agreement.

Respectfully, your Honor, we think you need to
view -- couple the knowledge here, and determine whether or
not it's sufficient to create intent and agreement at this
pleading stage, without any discovery, in the context of
what that knowledge is and what those facts are.  Your
holding essentially would find that any bank that has
knowledge and knows, not just because it's generally out
there, but because they've been presented with very specific
allegations of what's going on here, and the alleged in your
tentative (sic) goes through this in detail.

It says that NGOs and advocates, in thousands of
letters, they gave specific examples.  They gave images.
They showed the tabs.  They showed the titles.  And they
nevertheless continued to fund this, to provide the tools
that it needed to continue to monetize it, and it wasn't
just some passive service that they were providing.  Visa,
at the last hearing, tried to analogize this to "Well, this
would extend liability to any service provider that turns on

37

1  the lights in the building."

2          We have to view the allegations here in the

3  context of what was happening, so we have two things.  We

4  have the Court's finding that the knowledge was sufficient

5  with respect to Visa.  We think, and we'll get to it in a

6  minute, the knowledge with respect to Redwood and Colbeck

7  was far beyond that, given their control and their reporting

8  rights that the complaint alleges, but we have the

9  knowledge.  That's established.  We also have the fact that

10  they were providing a material and critical tool that this

11  company needed to operate, and we --

12          THE COURT:  So was the power.  I mean, I am

13  somewhat persuaded by the idea that, like, you could haul a

14  utility company in here, presuming that the NGO had sent

15  the -- you know, had sent Edison a letter that says, "Hey.

16  You know, those MindGeek servers that you're providing power

17  for, they have CSAM on them," and then the utility is

18  liable?  I mean, that just -- it just seems to me to be

19  extending the idea of a conspiracy far beyond what it's

20  actually intended to be.

21          MS. TABAKSBLAT:  Well, the distinction, I think,

22  in the hypothetical that the Court just gave is that the

23  utilities provider is -- they're indifferent.  They're

24  indifferent to what service the company is providing.  If

25  MindGeek wasn't there, and they weren't engaged in legal

38

1  activities, some other company would be there.  They have

2  absolutely no stake.  They have no outcome in what the

3  service is and whether or not it's engaged in illegal

4  activity.  By contrast here, Redwood and Colbeck, they were

5  making hundreds of millions of dollars based on this

6  business model, and these are the same.  They were making

7  hundreds of millions of dollars based on providing this

8  tool.

9          So let's just focus on Visa for a second.  There's

10 two critical pieces here.  One is, we know how critical it

11 was because, the moment that they decided to terminate the

12 services, MindGeek took down 10,000,000 videos.  This wasn't

13 just a passive nonfeasance, one of, you know, hundreds of

14 different vendors that provide services to a company.  This

15 is a critical tool that they're giving, and we also know

16 that from the financing agreements that Redwood and Colbeck

17 attached to their papers.  Those agreements show that, in

18 the event that either Visa or Mastercard terminate the

19 relationship with MindGeek, that creates an event of

20 default.

21         So this isn't -- they're not just simple vendors,

22 your Honor.  They are actually the keys and the tools, as

23 Judge Carney found, that MindGeek used to engage in this

24 illegal activity.  They couldn't further the illegal

25 activity without actually -- without Visa's credit card

39

1  processing services.

2          And so, with respect to this whole idea that this

3  is passive nonfeasance, I think first, as an initial matter,

4  you have their due diligence, but, putting aside their due

5  diligence, you have the NGOs coming to them in a storm in

6  2020, telling them that there is an abundance -- that the

7  majority of this site is littered with illegal activity.

8  They don't ask a single question.  They don't do an

9  investigation.  They don't suspend services.  They don't so

10 anything, and the reason they don't do that is because they

11 knew it all along, and they intended to.

12         And then what happens in December 2020?  And this

13 is critical, your Honor.  They -- Mastercard announces that

14 they're, you know, going to do an investigation.  Visa

15 follows suit.  The complaint, you know, includes both of

16 their quotes.  Visa's is a much more watered-down approach.

17 But then what the complaint also alleges is that, weeks

18 later, Visa quietly goes back.  They go back because there

19 was this intent to participate.

20         There was an agreement.  They knew all along what

21 tool they were providing.  They were critical.  The loan

22 agreements with the lenders understood that, and, the minute

23 they pulled, MindGeek could no longer operate its illegal

24 operation.  They took all the videos down.  So it's not just

25 looking at this knowledge in isolation.  It's knowledge

40

1   coupled with what they're doing.

2          And I think the Court, in their tentative -- and,

3   obviously, Visa and Redwood relied heavily on the Twitter

4   decision and the Court's reasoning there, and Twitter, your

5   Honor, is just plainly distinguishable.  One of the things

6   that really jumped out to me about the Twitter decision --

7   first of all, it's obviously a different statute and a

8   different standard.

9          The Salesforce decision addresses it, and talks

10  about how it's a more stringent standard than the standard

11  here, but one of the very, very critical relevant facts that

12  the Supreme Court relied on in Twitter was that there was no

13  allegation that Twitter had actually reviewed the post that

14  ISIS was putting up.  They didn't know that it was using

15  their platform in a way to further their illegal activity,

16  and that's what distinguishes it here.

17         The complaint alleges knowledge.  The Court

18  already found it.  The complaint also alleges that, in light

19  of that knowledge, they continued, affirmatively.  This

20  isn't just any service provider.  They were the tools.  They

21  were the critical aspect.

22         So, respectfully, your Honor, we think, under

23  these circumstances, your tentative with respect to Visa

24  under those facts, we need, at the pleading stage, to get

25  the inferences, the inferences we're entitled to under a

41

conspiracy count.  We need the discovery as to what they

knew.  We need the discovery as to the communications.  We

need the discovery -- you know, your Honor -- I think one of

the other things that your Honor focused on is that Visa was

putting pressure on MindGeek to make changes.  What --

that's a factual question as to what they were doing, and

what those communications were.  We're entitled to that

discovery.  We're entitled to see this information that's

uniquely in the hands of the Defendants, to determine

whether or not there was this intent and agreement.

        Respectfully, we think, based on the allegations,

that the complaint sufficient pleads this here.  This is

completely different than any service provider that was

completely indifferent.  They understood it.  They were

making hundreds of millions of dollars, and when they were

forced to suspend it, they took it down, and they quietly

went back so they could continue to do that.  That evidences

the required intent and agreement at this pleading stage,

before we have the benefit of their internal documents.

        And we think that the allegations with respect to

Redwood and Colbeck go far beyond that.  The complaint

alleges that this entity, MindGeek, and the business model

that it created, it never could have been created without

the hundreds of millions of dollars in financing that

Redwood and Colbeck provided.

42

1          When they did so, they had -- they did extensive

2    due diligence and analysis with respect to what the business

3    model was, how they were going to make money, and critical

4    to that ability to make money was this unrestricted content

5    model that, inherent in it, involved the solicitation and

6    the monetization of CSAM.  They knew it.  What do they say?

7    And they knew it, and, in furtherance of that, they gave

8    them the tools, the hundreds of millions of dollars of

9    financing that they needed, but that's not all the complaint

10   alleges, and it's not just based on our very detailed

11   investigation.  It's also based on the deposition testimony

12   from some of the MindGeek executives here.

13          Mr. Bergmair testified that they effectively

14   controlled the company, that the company needed to do

15   whatever Redwood and Colbeck said.  He -- there is also

16   evidence in this case that they spoke -- and this comes,

17   again, from the testimony of those executives -- that they

18   spoke regularly to Mr. Antoon and Mr. Tassillo.  They knew

19   what was going on in this company.  They knew what the

20   issues were.  They knew how they were making money.  They

21   knew they were monetizing this content, and they knew it,

22   and if they didn't know it from that, they knew it from the

23   reporting.

24          Their agreements required reporting all the time.

25   That reporting required them to tell them about how they

43

1  were making money, what type of content was on that site.

2  It's all alleged here, and, at a minimum, your Honor,

3  there's question of fact abounds about what the reporting

4  said, what they were told.  Were they told about this

5  nonconsensual content?  Were they told about the terms that

6  were driving this traffic?  All of that is subject to

7  discovery, and so we need that discovery in order -- before

8  you can make any determination with respect to intent and

9  agreement.

10            So you have the regular communications.  You have

11  their control.  You have their expensive reporting rights.

12  So -- and when you put all of those pieces together of their

13  involvement and their -- and so how do we know that we get

14  to an agreement and intent?  They re-upped.  They re-upped

15  in 2013.  They said, "Look.  We're making so much money.

16  This is going great.  This unrestricted content model that's

17  been pitched to us and reported to us, it's making money.

18  We're making hundreds of millions of dollars."  So they both

19  agreed to give more money in 2013.

20            And then what happens in 2017 and 2018?  And the

21  complaint alleges this in detail, and, again, it's based on

22  the testimony from the individual Defendants.  Redwood

23  decides, "We're making so much money.  This illegal

24  sex-trafficking venture, we're getting rich off of it.  We

25  don't want Colbeck here anymore.  We want to take a bigger

44

1  piece."  And Colbeck knew it, too.  How did they know?  They

2  didn't want to get out.  And so Redwood bought Colbeck out.

3  There was an agreement, and it's all alleged in the

4  complaint, so that Redwood could take a bigger piece of the

5  pie.  And then, in 2020, Mr. Pearl here came up, and he

6  showed you a letter that they wrote where they're

7  demanding -- well, that's not.  That's the window dressing,

8  your Honor, the same way that the Court asked the correct

9  question, and we addressed this in our briefing, "Can't you

10 just write letters and put covenants in?"

11        What Mr. Bergmair testified -- and we -- the

12 Defendants attached the testimony, so it's in the record --

13 is that Redwood actually didn't say, "We're declaring a

14 default."  They actually raised their interest rate.  They

15 leverage the explosion that came out of the Kristof report

16 to actually make more money here.

17        So, your Honor, I don't know what else we can put

18 in front of you at this stage, before we have their internal

19 documents of their intent and agreement.  All of these

20 affirmative actions that they've taken, coupled with that

21 knowledge, is more than sufficient to establish the

22 requisite intent, circumstantial evidence of intent and

23 agreement at this stage.  We need their internal documents.

24 We need to understand what communications there were about

25 the compliance with law provisions that they cite to.

*Echo Reporting, Inc.*

45

1          We need their internal communications about the
2   reporting.  What was actually reported?  What did they do
3   about that reporting?  We need internal communications so we
4   can understand what level of exercise, and extent of the
5   exercise and control they had over those companies.
6          It's all alleged in the complaint.  They dispute
7   it.  That's for discovery.  You can't decide that today,
8   respectfully.  And then we need the internal communications
9   about what Redwood and Colbeck did, or what Redwood did,
10  post-2018, why they decided to buy the loan out from
11  Colbeck, why they decided to pay them such a huge piece --
12  such a huge fee to get a bigger piece of this, why, in 2020,
13  they didn't just immediately declare a default, and why they
14  increased their interest rate, as Mr. Bergmair testified to.
15         When you put all of these allegations together
16  with the knowledge that the Court's already found, that's
17  more than enough at this stage.  Respectfully, your Honor,
18  we ask that the Court sustain the claims here and give us
19  the discovery, so that the Court can assess intent and
20  agreement based on a full record.
21         THE COURT:  Okay.  Anything else?
22         MS. TABAKSBLAT:  If you don't have any questions,
23  that's it for now.
24         THE COURT:  I don't.  Thank you.
25         Mr. Tulumello?

46

1        MR. BOWE:  I was just going to address the --

2        THE COURT:  Okay.  Yes.  Okay.

3        MR. BOWE:  First, your Honor, thank you for all

4   the time last time, and then for the opportunity for us all

5   to bury you with more briefing, and then come here and bury

6   you in more words, and then for two more tentatives, and the

7   patience.

8        Your Honor, not surprisingly, we think the Court's

9   tentative is a little offshore, and we think so for a few

10  reasons, but, with respect to the personal jurisdiction and

11  the other decisions, the course correction I would like the

12  Court to make is to take a step back and revisit the

13  standards that apply at this stage of the proceeding,

14  because the standards that apply at this stage of the

15  proceeding are not to try to case.

16       So we just saw a PDF slide show, which is from

17  Redwood, about covenants and what they mean, and they should

18  mean.  They certainly have probative value, and there's

19  certainly an argument that they can make that clearly no one

20  would put these covenants in who knew about this.  But it's

21  also the case that that's not definitive, and that there are

22  a lot of other facts that we have alleged, including the

23  fact that they loaned $700,000,000, and the practices in the

24  industry about what you do before you loan $700,000,000, and

25  the practices in the industry about what you do to monitor

*Echo Reporting, Inc.*

47

and understand what's going on in the business when you have
$700,000,000 out there, in the context of all the public
reports that go on for 20 or so pages in the complaint about
what they would have known during that time.

We're entitled to have our allegations accepted as
true, and all reasonable inferences be taken in our favor,
and that is the context in which I want to address your
Honor's order.

THE COURT:  Well, except that that's not true in
the personal jurisdiction context.

MR. BOWE:  It is qualified, your Honor --

THE COURT:  Yes.

MR. BOWE:  -- but I think that's important.  I
think that's where we left off when you and I were talking
last time.  The standard is very important.  The allegations
are accepted as true, as long as they are not conclusory,
but they have facts, unless --

THE COURT:  And they're uncontested.  Right.

MR. BOWE:  Uncontested by equally specific and
factual evidence, not counter, right?  And that evidence,
your Honor, has to make any alternative inference
unreasonable.  It's not the case that they can come up with
a piece of evidence, like they do here, and they say, "Well,
we can't be insolvent, because we had this deal where
somebody agreed to pay us $400,000,000 in the future."

48

1          Maybe -- I understand that has probative value.
2    No one would agree to pay something, perhaps, if it wasn't
3    worth it.  But it's not definitive.  It's not that there's
4    not another argument out there.  So they can't simply come
5    up with a separate fact that essentially argues for a
6    different inference, and I think, your Honor -- I'm glad you
7    brought that up, because I think that's part of what -- the
8    course correction I'd ask the Court to make.
9          So, for example, with respect to solvency, we
10   allege in detail, at paragraphs 314 to 23, 353 to 61 in our
11   opposition, 66 to 67, 83 to 84, and in an expert report from
12   an expert, a CPA, that MindGeek was, in fact, insolvent from
13   the beginning, based on various things.  One, according to
14   Bergmair, it would have been insolvent but for the tax
15   structure they put in.
16         We allege in the complaint specific factual
17   allegations as to why that tax scheme was fraudulent and a
18   sham.  We put in an expert affidavit on our opposition to
19   the motion, explaining why that tax scheme was an illegal
20   sham.  They came back with no specific evidence to dispute
21   that.  All they said was "Well, lawyers put in a brief.
22   Well, important unnamed lawyers and accountants looked at
23   that."  So that's an example, your Honor, of evidence --
24   allegations we made that are not disputed, that you have to
25   take as fact for the purpose of this motion.

49

1        THE COURT:  Yes, but those things don't follow.
2   The step A, Mr. Bergmair says, "We would have been insolvent
3   had we not used this tax scheme."  Your evidence says that
4   tax scheme is completely bogus and designed to evade taxes.
5   It's a sham.  Those two things are consistent.  Even
6   assuming that both of them are true, they can coexist.  That
7   doesn't make it insolvent.  That means that it is solvent,
8   based on this -- because they've managed to evade taxes.
9   Right?

10       MR. BOWE:  Right.

11       THE COURT:  That doesn't draw me to an inference
12  that it's, in fact, insolvent.  It draws me -- even
13  accepting your evidence as true, or contention as true, that
14  draws me to the conclusion that they are solvent, partially
15  because they are -- have engaged in tax fraud.  Right?

16       MR. BOWE:  All right, your Honor.  Well, I --
17  respectfully, your Honor, that is an inference you could
18  draw from that.  There is an inference that one could also
19  draw that, because the actual tax scheme is not real, is a
20  sham, they are, in fact, insolvent, and, in fact, those are
21  arguments that are made every day across this country in
22  Bankruptcy Court, that the actual regime, either the
23  accounting regime or the tax regime that a company had, was
24  not valid, and, therefore, its actual economic interest and
25  interests were other than that.  A fact finder could decide

50

1 on either one.

2        But let me move on to the second bit of evidence

3 we give from the start.  MindGeek was in debt at the

4 management buyout -- it was a leveraged buyout -- to the

5 tune of almost $800,000,000 to the hedge funds.  The

6 undisputed allegation in the complaint is that the MindGeek

7 organization that is Defendant here could not pay that debt,

8 because, as part of that tax organization to mask Mr.

9 Bergmair's membership, the business was divided into two

10 separate, completely separate, in theory, corporate

11 entities, MindGeek and RT Holdings.

12        The only relationship they had between each other

13 was a licensing agreement, but half, almost half, of the

14 company's revenues and value were in RT Holdings, which

15 happens to be where the three individuals -- the only place

16 where they actually reflected their -- what they say were

17 their agreed-upon ownership interests.

18        The debt was guaranteed by RT Holdings, supposedly

19 in an entirely arm's-length separate entity, and the

20 complaint alleges that RT Holdings was servicing that debt

21 along with MindGeek, that is to say, MindGeek itself had

22 more debt than it could service, more debt than it was

23 valued.  Now, that wouldn't matter to the lenders, because

24 the lenders took a guaranteed and secured on both entities

25 that were supposedly separate.

51

1            However, as to any other creditor of MindGeek,

2  MindGeek was insolvent.  That's our allegation.  There is

3  nothing that comes back on the allegation -- from -- on any

4  motion that disputes that, but, as an example of what your

5  Honor mentioned, they do come back and say, "Well, but this

6  entity generated $200,000,000 in revenue.  In this year, we

7  had so many earnings."  Your Honor, it is just an

8  established fact, again, that gets litigated in bankruptcy

9  and other federal courts in the United States.  You cannot

10 determine solvency based on a particular amount of income

11 that comes in, without reflecting on what the liabilities

12 are and what the assets are.

13           So they make -- they do present evidence that

14 there is so much income that comes in.  That has probative

15 value, but it doesn't -- it is not definitive to say that,

16 therefore, our allegations that are completely separate --

17 they don't deny that there was $700,000,000 worth of debt.

18 They don't deny and present evidence that MindGeek could

19 service that debt without RT Holdings.  They don't deny the

20 guarantee.

21           So, in those circumstances, your Honor, just

22 because they put out a fact from which they could argue a

23 different inference, "Well, no, we're not -- even if those

24 facts Mr. Bowe alleged are true, look.  We had $200,000,000

25 in this quarter.  Clearly, we weren't insolvent" -- you

52

1  could make that argument.  We would argue, and a fact

2  finder, perhaps, would accept it, but it doesn't -- but, on

3  this -- for the purposes of this motion, the Court has to

4  accept our facts that they haven't specifically in evidence

5  to dispute, and accept our inferences, and not theirs.

6          So, with respect to how that plays out in your

7  Honor's tentative order, I think there -- yes.

8          THE COURT:  Just -- it's my recollection that, at

9  the last hearing, you essentially conceded that the

10 non-contesting Defendants were not judgment-proof.  Are you

11 taking that back?

12         MR. BOWE:  Your Honor, you just grabbed my next

13 line.

14         THE COURT:  Okay.

15         MR. BOWE:  At the front -- I was going to say

16 there are two things in your order that I really think hinge

17 on the direction that -- I think it should be a different

18 direction.  The first is sort of up front, where you make

19 the same statement that you made last time I was here, that

20 I was responding to when I brought up the cases about single

21 enterprise, and your point was "Well, alter ego always

22 requires some type of insolvency or lack of

23 creditworthiness."  And in your order, you make the point,

24 quote, "In almost every instance, the cases that both of us

25 cite involve a creditor that can't be satisfied."  "Almost

53

1  every instance."

2         I don't think it's almost every instance.  Maybe

3  it is, maybe it isn't, your Honor, but it's not all of them,

4  and, in fact, for the most of our cases, not all of our

5  cases, but most of our cases, the creditworthiness or

6  solvency of the Defendant was either not a factor or not a

7  determinative factor, and the reason that is critical is

8  because every case they have cited, and every case we have

9  cited, and every case you cite in your decision, and you, in

10 your decision, yourself, make it clear that no single factor

11 is determinative.  Every one of those cases includes

12 insolvency, the diversion of capital as a factor, but not a

13 single case cited by the Defendants, and there is no such

14 case in the Ninth Circuit or anywhere that says that is the

15 absolute essential element of an alter ego claim, because it

16 is not.

17        So what I was trying to say when I got up last

18 time -- and we have a footnote on this, because the

19 Defendants came back and said, "Well, Mr. Bowe conceded he

20 couldn't prove an equity, and he was trying to show you

21 there was no need."  Judge, if you go back and read the

22 transcript, they have a quote, and if you keep reading what

23 I say, I actually am reading from the dec I handed up, from

24 Las Palmas (phonetic), that says, "The two elements are

25 unity of interest and an inequitable result."

54

1          My point was that what those cases made very clear
2    was that, for alter ego, you didn't necessarily need a lack
3    of capitalization or a diversion of assets.  That is
4    certainly the classic sort of slam-dunk proof, and,
5    therefore, your Honor, it might be that you're right when
6    you say, "Almost every case," because that's sort of the --
7    that's the way it comes up, usually.  Okay.  But we -- but
8    that's not required, and I was never saying -- and I think,
9    if you go back and read my argument, your Honor, you will
10   see that I wasn't saying we couldn't prove or we didn't need
11   to prove it.
12          What I said explicitly was -- I was quoting you
13   those cases, and what they were saying was, it is
14   independently inequitable to allow an individual owner, or
15   an owner, to run a company or a group of companies without
16   regard to the corporate forms, and then, when those
17   operations result in liability, to step back and say, "Hey.
18   I have these corporate forms."  The cases that we handed up
19   to you, any number of cases in the Ninth Circuit -- we cite
20   them in our letter, your Honor.  There's the <u>Seymour</u>
21   (phonetic) case from the Ninth Circuit, where, quote,
22   "Incorporators," close quote, use the corporate form, quote,
23   "to avoid civil or criminal liability."  The <u>Tau</u> (phonetic)
24   case:
25          "The courts have not hesitated" --

55

1          or "where" -- "to ignore the corporate

2          form where it would frustrate the intent

3          of a statute such as to hold" -- "such

4          as to have a defendant avoid a public

5          convenience, justify a wrong, or evade a

6          duty."

7          The Unocal (phonetic) case that they cite says

8 that:

9          "Whereas any entity that is set up

10          solely for a tax or finance purpose,

11          without an independent reason for

12          operations, but is otherwise operated

13          together, there is no basis to

14          distinguish between part and whole."

15          Those cases don't depend on solvency, and the best

16 case for you to quickly go and look at this, your Honor, is

17 the Las Palmas case, because, if you look at 1240, 1251, and

18 1252 of Las Palmas, the Court considers the following

19 argument from the defendant, or the alter ego defendant.

20          The Court -- the defendant argues it was improper

21 to hold them as an alter ego because, at the trial, the

22 parties stipulated that the defendant, in privity, was worth

23 4.1 million dollars, and the total amount at issue was one

24 point something, and, therefore, the element that -- their

25 precise argument, that clearly there's enough money, so,

56

1  therefore, alter ego can't be satisfied, and the California

2  appellate court says, "That's not the standard.  The fact

3  is, the Defendant was actively involve in a way that ignored

4  the corporate form.  Therefore, alter ego is separately

5  available."

6          The Court goes on, your Honor.  The Court goes on,

7  because the Court then reduced the actual award, and the

8  Court went on to say, "It doesn't matter whether there's

9  evidence or not, whether this judgment can be satisfied by

10 the Defendant in privity.  Maybe it can, maybe it can't.

11 It's not how you make the decision," because, the Court

12 says, "We have no idea whether, in the future, by the time

13 it comes where the appeal is over and a judgment is

14 enforced, whether the money will still be there or will have

15 been depleted."  The Court is saying, "That is beside the

16 point."

17         THE COURT:  Well, but I guess this is -- I agree

18 with you that that's not a prerequisite to applying the

19 alter ego theory, but my question, I guess, to rephrase it a

20 little bit, is, what is the injustice that makes -- what --

21 now you had jurisdictional discovery.  What is the injustice

22 that you posit to satisfy the second prong that, you know,

23 would compel me or -- that's the wrong word -- move me to

24 bring in the entity and the individuals that I have kicked

25 out in the tentative?

57

1          MR. BOWE:  I think that's easy, your Honor,

2   because the Ninth Circuit cases that I quoted before,

3   Seymour, Sheffords (phonetic), Tau, Unocal, the California

4   cases that they often cite, Las Palmas, the Wolf (phonetic)

5   case, a Ninth Circuit case, Telegen Uriarte (phonetic), we

6   cite all these in our supplemental brief, M and M Install

7   (phonetic), Pacific Maritime.  They all stand for the

8   proposition that it's not the injustice.  Could be that they

9   use the form to sort of take the money and run, could be,

10  but many of them don't talk about that at all.  They simply

11  say you can't use the entity in a way that's not consistent

12  with having a separate entity, and then just leave the

13  entity there and say, "I have no responsibility.  You can't

14  touch me."

15          That is itself an injustice, and what Las Palmas

16  says is, therefore, it doesn't matter whether the Plaintiff

17  maybe somebody could get money out of this Defendant.  It's

18  entitled to go after this Defendant.  It's not whether

19  the -- it's directed toward the Defendant, not the

20  Plaintiff.  The law is simple.  What is injust, what all

21  these cases say is injust, is that it's injust for me to

22  pretend I have a corporation when the activity that I

23  engaged in that caused the harm wasn't operated that way.

24          And I think, your Honor, in this case, in this

25  case, it is -- should be the poster child, because, when we

58

1  go through in the complaint, both from the beginning and

2  then at the end, with the sale, what we describe are classic

3  asset diversion structures.  So I described for you the

4  structure that existed in the beginning, all the way through

5  the filing of this complaint, which was MindGeek had

6  $800,000,000 of debt.  Half of its value was in a total

7  separate entity, whether the three Defendants actually owned

8  the interest they had.

9          If there is some judgment issue with MindGeek, the

10  lenders have secured money.  They take all their value out.

11  It probably won't be enough value, because that's why RT

12  Holdings is there.  They can reach into RT Holdings.

13  Creditors can't.  Whatever is left the Defendants get, and

14  creditors can't.  Come to the end.  That's the $400,000,000

15  sale.  Let's talk about what happened before that.

16          Before the $400,000,000 sale, this company was

17  worth a billion something.  There was $700,000,000 worth of

18  debt at one point.  Its value was supposed to be at that

19  amount, but, of course, as you just heard, it lost 80

20  percent of its content.  Visa and Mastercard stepped away.

21  It ended up being in a deferred prosecution with the

22  Department of Justice for trafficking-related offenses, and

23  then it ends up in a sale, which is really an IOU.

24          So, all of a sudden, the sale is for a third of

25  the value, 400, but, according to Defendants, they got 10 up

59

1   front, and they're going to get paid the balance sometime in
2   the future, out of the company, without any evidence,
3   because discovery was objected to, and I'll get to that in a
4   minute, about "What are the liabilities of the company?"
5          But that is a classic structure, Judge, where what
6   the individual Defendants are going is handing the company
7   to somebody and saying, "I sold it."  That person didn't put
8   any money up front.  And they're saying, "Well, now I'm
9   out," and that entity is going to pay them the remaining
10  amounts over some period of time.  That is exactly what Las
11  Palmas is talking about.
12         And where does that leave the Plaintiffs here, and
13  the hundreds of other women who were victimized?  Where it
14  leaves them, your Honor, is you're saying, "You can go sue a
15  piece of paper," a piece of paper that it is undisputed --
16  our allegation is that those pieces of paper are -- have no
17  employees, no offices, no nothing.  They have nothing.  And
18  those Plaintiffs do not, under any of these cases, have to
19  take the risk that, if they get a judgment, those pieces of
20  paper will have the money.
21         They don't have to prove today there's no money.
22  They don't have to prove the company is insolvent.  They
23  don't have to prove they're already-diverted assets.  What
24  they have to prove is that the parties who actually did it,
25  the three individual Defendants, who were supposed to be

60

passive, completely uninvolved, ultimate beneficial owners,
but that the complaint alleges directly and personally
controlled that company, do not get to simply walk away
without having to answer in court for what they did, in
complete disregard of the fiction.

I mean, their testimony is in the complaint, your
Honor.  They're like, "I have no idea what you're talking
about, the structure.  I don't know what it is.  We didn't
follow it.  We just did what we did.  We ran it.  I don't
know what the structures are.  I don't know any of it."  It
was a complete fiction, maintained by a handful of lawyers
and accountants who would fill in some of the paperwork
every year.  So the injustice that these cases cite, and the
injustice that I think is obvious to anybody, when you think
about it, is that precise injustice.

THE COURT:  But isn't that -- that's just
collapsing the two prongs into one.  You're basically
saying, if the first prong is filled, then the second prong
is filled.

MR. BOWE:  No.  No, because you could have --
under unity of interest, you often have a CEO who is -- who
ignores the -- to get to the example you were focused on,
your Honor, you have a CEO who takes assets out on their
own, but otherwise observes corporate formalities, doesn't
dominate the entity.  Then you have -- then there's an issue

61

1    of whether that parent or that shareholder has to, on that

2    particular issue -- whether they sufficiently -- whether

3    their actions violated the corporate form, or would those

4    particular actions prejudice the Plaintiffs' ability to

5    recover?  It doesn't make them generally liable for

6    everything.

7            And there's a host of examples like that.  That's

8    usually where it comes up in.  That's where your Honor --

9    that's where your instincts -- and, frankly, I admitted to

10   you when I stood up, those are my instincts, because the way

11   we usually deal with this is, there's a company that

12   observes corporate formalities, but then deviates from

13   corporate formalities in a particular way that prejudices a

14   particular party.  That's usually how it comes up.  Those

15   factual circumstances do not lead to the liability I'm

16   talking about, because we're not saying that those owners

17   completely and utterly disregarded the corporate form, but,

18   in those circumstances, Judge, the cases are very

19   consistent.

20           Where you have a situation -- which is what we

21   allege.  They can come in and say it's not true, and they

22   can argue that, and we can -- when we have discovery on it,

23   we can do that, and we can try it.  But what we allege is,

24   in detail -- it's 100 paragraphs -- that this corporate

25   structure in the chart was on paper, and a few accountants

62

1  put all the numbers in the right places, but the people who

2  were supposed to be running the place in Luxembourg didn't

3  exist.

4        The office that was supposed to be there had all

5  the wires out, and no one was in there.  The operating

6  companies in Cyprus were the same.  Everything was being run

7  by these three individual Defendants, two of whom were in

8  Montreal, where it was being done.  The other one, who had

9  an office there, came there for all the critical quarterly

10  and annual meetings, went on all the important industry

11  events, where they interacted with and contracted with and

12  did all the stuff they were supposed to do with vendors and

13  talent and advertisers, and he went there as the chairman.

14        So, in this extreme situation, where you have a

15  corporate form that exists only on paper, and bears zero,

16  zero, connection to what they actually did, the cases are

17  clear, in far less egregious circumstances, that those

18  individual Defendants fairly and equitably can be held to

19  account.  That's what the cases says.  That's what we

20  alleged.  Now, your Honor might not agree with the facts.

21  Your Honor might say, "I find this, I don't find that," but,

22  at the moment, we get those allegations applied to that law,

23  and we get to go forward.

24        THE COURT:  Only if they're uncontested.  I mean,

25  it becomes, essentially, a motion for summary judgment once

63

1  they're -- once those allegations are contested.

2        MR. BOWE:  Well --

3        THE COURT:  You've had jurisdictional discovery,

4  and so it was your job to create a genuine issue of disputed

5  fact, right?

6        MR. BOWE:  No.  No.  No, no, no.  No, your Honor.

7  This -- the standard works as follows.  Our allegations are

8  accepted as true before discovery.  They are accepted as

9  true after discovery, unless they are specifically and

10 factually contested by a specific fact that contests that

11 fact.  So there are no -- there is no evidence that has been

12 presented that contests, for example, the hundred pages of

13 evidence we put in about how the individual Defendants ran

14 this company, in every way possible, in a way that was

15 completely inconsistent with the corporate form.

16       What there is, your Honor, are a few pieces of

17 evidence they put in to say, "Well, but wait a minute.  They

18 don't say they didn't do those things.  They say, 'Well, but

19 we did these things.  We kept minutes, and we had some

20 financial statements.'"  Okay.  That doesn't -- I didn't say

21 they didn't have financial statements.  I didn't say they

22 didn't take minutes.  The law is not that you can ignore all

23 your corporate formalities, but, as long as you have some

24 financial statements and minutes, you're good.  That's not.

25 So that is the wreckage you have before you.

64

1          We have 100 pages of allegations.  Ninety-nine

2    percent of them are untouched.  They come in with a few

3    pieces of fact and say, "Look at this fact, Judge.  We had

4    disclosures.  We had -- we filed a default," or "We had

5    financial statements.  We had minutes.  One quarter, we had

6    $20,000,000 of revenue."  Okay.  That leaves you to guess,

7    as a fact finder.  You would have to accept their one or two

8    facts, which I get it, Judge.  They are probative.  That's

9    why I started where I started, because I'm here, and I do

10   the same thing when I'm on the defense side.  I bring in the

11   evidence, and I say, "Look at this evidence," and I try and

12   try the case here.  That's not what we're supposed to do.

13          These women are entitled to have their allegations

14   properly accepted unless specifically with evidence

15   contested, and then, even if there's direct evidence that is

16   contested, which here, Judge, I don't think there's a single

17   shred -- there's certainly not one for every one of our

18   allegations.  But, even where there is, if it's just a

19   disputed fact, we go forward.

20          THE COURT:  But, again, the undisputed facts that

21   you're talking about are the ones that I actually don't rely

22   on.  They are -- they go to the unity of interest, or the

23   lack of observance of corporate formality.  Fine.  I accept

24   your allegation that they didn't do that.  Beyond that,

25   though, there's a second prong, and I guess what you're

65

1  telling me is that, in this case, the violation of the first

2  prong is so egregious that the second prong is satisfied.

3  Is that a --

4          MR. BOWE:  That is what the -- your Honor, the

5  cases that we cite for you, that is what they say, and that

6  is what all -- every case they cite, and every case we cite,

7  and all the cases you cite, say it can be any combination of

8  these facts, because it's equitable, but what they clearly

9  say, in facts that don't go anywhere near as close to what

10 we have here, that where you just have a Defendant that's

11 just not -- is operating rogue, and those operations create

12 a liability, then it's equitable that that shareholder be

13 held liable, and there's three trafficking cases we cite.

14         THE COURT:  Well, wait a minute.  That's actually

15 one step further than I'm going.  I'm only addressing

16 whether or not they can be hauled into court, here.

17         MR. BOWE:  Right, but your Honor says -- we put in

18 cases that say that's a lower standard.  Your Honor rejects

19 them.  That's fine.  Let's just deal with the standard.

20 It's the same.  Say it's the same.  Okay.  Right.  Yours is

21 a shorter standard.  I think the standard is more forgiving

22 than a liability standard.  There's cases that say that.  It

23 makes sense.  But it doesn't matter here, Judge, because we

24 alleged so much -- we allege sufficient facts to overcome a

25 summary judgment at this point, and present it to a jury.

66

Maybe they buy it, maybe they don't, but we're entitled to that.

These women are entitled to that, which brings me to, especially when we're talking about equity -- we were here last time. Your Honor's decision in part rests on the idea of the sale. You cite their argument. Well, there was a sale, so that gives -- what your Honor says is, that creates some inference that they were solvent. Fair, Judge. I can argue that creates an inference, as I have here, that it's insolvent, for the reasons I mentioned.

You can't decide those inferences right now, but -- but -- there is a fundamental point of fairness here, Judge, which, you know, counsel saw it coming when he got up and said, "Well, Mr. Bowe agreed to this limitation. Mr. Bowe could have gone and made motions to compel if he wanted the evidence as to present."

All of that is true, but I don't have to, if their objection is -- which it was, and we cite support for this in our supplemental brief, Mr. Sack's statements to the magistrate early on, where he said, "Judge, we agree. Our position is, the only relevant discovery is for the time period where this misconduct occurred, nothing after," and the magistrate accepted that. We objected to that. She accepted it. Once you, as a party, do that, you cannot show up later in a hearing of any type and now want to present

67

1  any evidence on that topic.  Under Rule 37, you are

2  precluded from doing so.  I don't need to do anything.

3         And we cite the Ninth Circuit <u>Hoffman</u> (phonetic)

4  case.  It's very good, Judge.  We ask that you read it.  The

5  <u>Hoffman</u> case is very clear.  If you take a position, and you

6  object to discovery, and you say it's not relevant, that

7  becomes the law of the case, either because Mike Bowe says,

8  "Fine.  Let's just not bother with it.  I'll stick with this

9  if you do that."  Then, if you show up later, and, like,

10  "I'd like to put this evidence in," I get to stand up and

11  say, "Rule 37."  That's how it was written, so we don't have

12  sandbags like this.

13         We took no discovery on what their solvency is

14  today.  The only thing we got, your Honor, was at the

15  depositions, which came all the way at the end of this

16  scorched-earth year, where the Court has the record -- it's

17  the Court's record -- Defendants fought discovery tooth and

18  nail.  That's their prerogative.  In the depositions, it

19  came out that they had sold this company.  I asked for the

20  terms of their deal on the -- and they objected, and they

21  instructed the witnesses not to answer.  My basis was not

22  solvency.  I said, "Well, at a minimum, it goes to bias.  I

23  mean, how much money are they entitled to get back?"

24         We went back and forth.  They agreed to give us

25  the agreements.  They objected to anything else as

68

1  irrelevant.  Fine, but they can't come in here now, Judge,

2  and you shouldn't, as a matter of fairness -- forget Rule

3  37 -- allow these Defendants to sandbag these women by

4  saying, "Well, no evidence of insolvency today."  That's

5  just not permitted by the rules, and your Honor shouldn't

6  permit it, just as a matter of fairness, which leads me to

7  my last point, your Honor.

8          You gave a decision as to Ms. Fleites.  I think,

9  if they're going to rely on stuff they objected to now, then

10  I should be entitled to the discovery they should have given

11  me then, no sanctions, just say, "Okay.  Well, you were

12  supposed to do that.  We'll just go back and look at it,"

13  but certainly whatever agreement I made or didn't make,

14  which is disputed, on Ms. Fleites' behalf, I didn't make on

15  behalf of any other Plaintiffs.  Those Plaintiffs, now that

16  they've raised this issue, are entitled to that discovery,

17  if your Honor is going to say, "I'm going to make a finding,

18  as a matter of law, that what they say is true."

19          Now, what I'm going to suggest to the Court is

20  something different.  We've tried the discovery thing.  When

21  you say I had the chance to create a question of fact, I

22  disagree, because the chance really was -- Judge Carney gave

23  the Defendants a chance.  My allegations were asserted as

24  true.  Defendants came in and put in an affidavit, and

25  basically, in two pages, said, "That's not true."  Judge

69

Carney said, "That's not enough.  You've got to bring in
evidence.  If you're going to bring in evidence, they've got
to have discovery.  Go do some quick discovery."

        If I were trying to get out on summary judgment,
genuinely, I would have said, "Okay.  I have" -- as they
admit they do -- "I have this electronic financial corporate
accounting system.  I have this electronic system.  We're
going to download everything, go get it, look at it.
Whatever questions you want, we'll give you."  They took a
different approach.  They took an approach that said, "No,
no.  The only thing that matters is the financial statements
and the minutes, and if you want anything else, we're going
to fight you, and you can look at the record, or you can
talk to the magistrate."  And we made progress, but we
didn't get everything.  Okay.

        Having taken that, it was their obligation, if
they wanted to put particular facts out that either
definitively disproved the facts I was going to make based
on the inferences that I sought, or based on things I didn't
even have, which they've now done, both -- I need to have
that discovery.  They made that decision.  As a matter of
prudence and efficiency, the Court should do what normally
happens in these circumstances.

        It's true that entirely bare-bones complaints get
tossed, but, for the most part, where you have 150

70

1  paragraphs of specific allegations, and 20 as to specific
2  solvency allegations, and some type of lawyer can get up and
3  at least give a reasoned explanation as to why those facts
4  would permit a reasonable inference that there was
5  insolvency, why those facts would permit a reasonable
6  inference that it would be unfair to let these people walk,
7  based on a structure they never even knew about, then the
8  Court typically says, "Go do discovery.  They can raise this
9  issue with summary judgment."
10         And that makes particular sense here, Judge,
11  because you have all these other Plaintiffs already, and
12  there's going to be Plaintiffs behind them.  They're
13  entitled to this discovery now that these issues have been
14  raised.  If we're really going to argue solvency today, then
15  we're going to need different discovery.  They objected to a
16  forensic audit into solvency.  They said they weren't going
17  to raise that.  Okay.  Now we know.  Fair enough.  Maybe Ms.
18  Fleites is out of luck.  I think that would be unfair, but
19  maybe.  The others didn't get their shot.  The ones behind
20  them didn't get their shot.
21         I like being efficient as a lawyer.  I know the
22  Court does, too.  The Court has framed the issues very well.
23  We think the Court is off the mark with respect to the issue
24  of whether solvency is required, and whether, in a case like
25  this, you even need any issue of finance.

71

1        But, for all those reasons, the Court should deny

2    this motion, for everybody, without prejudice to renew it at

3    summary judgment, where there will be a full record, and

4    your Honor can hold a hearing, if you wish.  I think that is

5    the best course of action, I think it's the fairest course

6    of action, and, your Honor, I think it's what the law

7    requires, for all the reasons I said.

8        So, unless your Honor has more questions, I thank

9    you very much for the time, and all the effort that you've

10   put into this to get it right.

11            THE COURT:  Thank you.

12       So, unfortunately, I do want to hear from the

13   other Defendants, but we now have five minutes until my hard

14   stop.  So I guess I'm going to invite you all back at 1:40,

15   unless there's an objection.

16            MR. PEARL:  Your Honor, just to clarify, you want

17   to hear from us on rebuttal?

18            THE COURT:  Yes, exactly.  Okay?  All right.  So

19   we'll see you at 1:30.

20            UNIDENTIFIED SPEAKER:  Thank you, your Honor.

21            MR. PEARL:  Thank you.

22            THE CLERK:  All rise.  Court is in recess.

23       (Proceedings recessed to reconvene.)

24

25

72

1                    AFTERNOON SESSION

2                         --oOo--

3          THE CLERK:  Please remain seated and come to

4  order.  Court is once again in session.

5          THE COURT:  All right.  We're back on the record

6  on the motion to dismiss hearings.  All counsel are present.

7  Sorry for the delay.  Why don't we go for brief responses to

8  any of the Defendants that want to respond.  I don't think

9  he raised anything about Section 230, so I think we'll skip

10  that issue, but, in terms of personal jurisdiction, do any

11  of the Defendants want to be heard in reply?  I guess I can

12  start with MindGeek.

13          MR. SACK:  Yes, if I could be heard.

14          THE COURT:  Okay.  All right.  Mr. Sack.

15          MR. WHITE:  Your Honor, Mr. Sack and I have

16  divided up the argument, so he'll cover some and I'll cover

17  some.

18          THE COURT:  Okay.

19          MR. SACK:  Thank you.

20          THE COURT:  Okay.  Great.

21          MR. SACK:  Thank you, your Honor.  Jonathan Sack

22  for Defendant David Tassillo, and I'll also be arguing on

23  behalf of the Defendant Feras Antoon, as well.

24          THE COURT:  Okay.

25          MR. SACK:  Before I get into a little bit more of

73

1 the detail about Plaintiffs' counsel's arguments, I'd like

2 to make a couple of general observations to center us a bit

3 on exactly where we are first.

4        We're here at a stage of personal jurisdiction,

5 and there was some discussion of the test for substantive

6 liability and personal jurisdiction, but personal

7 jurisdiction is important to focus on.  There's no general

8 or specific personal jurisdiction here over the two foreign

9 Defendants I'm speaking on behalf of.  We're solely talking

10 about personal jurisdiction under an alter ego theory.

11        On that theory, the Plaintiffs have a burden, and,

12 as the Court pointed out, it's a high burden, and I think

13 the Court has a vital gate-keeping function here to prevent

14 foreign Defendants from being hailed into court based on the

15 sort of conclusory allegations that your Honor pointed out

16 in the tentative ruling, based on the sort of speculation

17 about possible financial issues down the road that your

18 Honor has heard about and focused on, and without any

19 showing of injustice to the Plaintiffs in this case from not

20 having these foreign Defendants in the case.  There

21 shouldn't be a collapse of the issues of personal

22 jurisdiction and substantive liability as the Plaintiffs'

23 kick-the-can approach, until two or three years from now,

24 would suggest, utterly unfair to the individual foreign

25 Defendants in this case.

74

1          Number two --

2          THE COURT:  Mr. Sack, I don't want to derail you

3    from what you're having to say.  You could return.  But, at

4    some point in your argument, could you address this idea

5    that, even if Ms. Fleites isn't entitled to any discovery on

6    this, now that the solvency is a question, why shouldn't I

7    defer until after there's been discovery as to the current

8    status or solvency of the entities that are not contesting

9    jurisdiction, before I make a determination as to the

10   personal jurisdiction of the others?

11         MR. SACK:  I will get into that in more detail,

12   but let me just respond on a headline level now, your Honor,

13   which is, the relevant period for purposes of personal

14   jurisdiction is through June of 2021, which was agreed upon

15   by the parties after litigation over discovery.  It was

16   agreed upon, and there's absolutely no issue of insolvency

17   whatever, or undercapitalization, as to the relevant period

18   for this case.

19         The only reason there's discussion about what

20   happened after mid-2021 is because, when my client and Mr.

21   Antoon and Mr. Bergmair were being deposed in jurisdictional

22   discovery, they were asked about a 2023 shareholder

23   agreement that they'd entered into -- excuse me, a stock

24   sale agreement that they entered into -- and Mr. Bowe

25   asked -- Plaintiffs' counsel asked questions about that

75

1  agreement.  Mr. Antoon and Mr. Tassillo answered questions.

2  There's been argument about that.  And then the Plaintiffs

3  asked for that agreement.

4         So that's been injected into the case

5  unnecessarily, but, now that it's here, we've made the point

6  that there's no issue of insolvency after 2021, either.  But

7  I think, as your Honor pointed out -- I think it was page 22

8  of the tentative ruling -- even if we took that issue out of

9  the case, this 2023 agreement, and what's happened since

10  2021, there's absolutely no issue of undercapitalization or

11  insolvency, or the Plaintiffs being able to recover, and I

12  would just say, in addition, there could always be an issue.

13  Lightning could strike these companies six months from now.

14         THE COURT:  Sure.

15         MR. SACK:  But this is not an open-ended process.

16  There has to be some closure.  The parties agreed on the

17  period through mid-2021.  We're only talking about the later

18  period because the Plaintiffs injected it into the case, and

19  the agreement and the testimony were unhelpful for this

20  argument about insolvency post-2021, and that should not be

21  then bootstrapped into a fact issue that needs to be

22  resolved now, given the way this case has been litigated,

23  through jurisdictional discovery.

24         I apologize, your Honor.  That was more than a

25  headline, but --

76

1          THE COURT:  That's okay.

2          MR. SACK:  -- I may return to that again.

3          I think the second point -- and it goes right to

4   this issue of insolvency, your Honor, is that, as your Honor

5   pointed out, the Plaintiffs' allegations in this case, at

6   paragraphs nine and 34 of the second amended complaint, are

7   that MindGeek dominated an enormous industry.  That enormous

8   industry generated -- was -- had tens of billions of dollars

9   in that industry, and that business generated enormous

10  amounts of money for these companies.

11         So, when Plaintiffs literally throw around,

12  without any evidence, without any documentation, issues

13  about insolvency or undercapitalization, that has to be seen

14  as discredited by the Plaintiffs' own allegations in their

15  own complaint bout the enormous sums generated by this

16  business, and that not only are those claims of insolvency

17  undermined by their own allegations, they're undermined by

18  detailed audited financial statements provided in discovery.

19  They're undermined by detailed financial books and records

20  provided in discovery, and there's absolutely a void of

21  evidence that these companies are undercapitalized or

22  insolvency.  There's speculation, but there isn't evidence.

23         And then the third high-level point that I'd make,

24  and then I'll get into a few more of the particulars, is

25  that earlier, when the Court asked Plaintiffs' counsel, you

77

know, was he claiming that the Plaintiff won't be able to
recover due to insolvency, or because the corporate
Defendants in the case would not be able to pay a judgment,
the way I heard the answer was that it was a non-answer.
There wasn't an answer to that question.

There's an implicit concession that this is not a
case where Plaintiffs couldn't recover from these
Defendants.  It's the move that was made earlier this
morning, was "Let's make the injustice standard so vague, so
nebulous, so arbitrary that pretty much anything could be
called an injustice whenever the Plaintiff makes some
allegation of unity of interest and control."

There's a collapse that's going on in those
elements to essentially be almost an "anything goes"
standard that would write the second element of the test out
of the law.  It's not what the Ninth Circuit says.  It's
just not the law.  And that's the move that's being made
here by Plaintiff, is to basically make it so nebulous and
so amorphous as to be meaningless.

So, getting more into the particulars, your Honor,
as your Honor stated in the tentative ruling, there's a
two-part test.  The second prong requires a showing of
injustice, and that second element has not been shown here.
There's been no showing that the MindGeek Defendants are
judgment-proof, or that the individual Defendants caused --

78

1  causation is important -- any injustice to the Plaintiffs

2  here.

3         So Plaintiffs now acknowledge there's a second

4  element to the test.  When we were here last, they wrote it

5  out of the test completely.  They now acknowledge there is

6  an injustice element, but they write it out of the test in a

7  different way now.  They write it out of the test in the way

8  I just suggested, and in the way your Honor really

9  identified in the tentative ruling, which is they want to

10 collapse unity of interest and injustice, and the test as

11 the Plaintiffs would say it would also essentially merge

12 injustice with the underlying allegations of wrongdoing.

13        Whenever a Plaintiff alleges some unjust thing

14 happened to him or her that -- and allege a unity of

15 interest in ownership, that would be sufficient for

16 injustice, according to the Plaintiffs' version of the test.

17 It would be, as you will, a just collapse of the test to the

18 point of nothingness for the second element, and that's just

19 not the law.  California law, as applied and interpreted by

20 the Ninth Circuit, makes clear that the second prong

21 requires a showing of acts of bad faith, and a fraud to be

22 done on the Plaintiff that would be unjust to the Plaintiffs

23 in some sort of concrete way in terms of a recovery.

24        If we were to take the Plaintiffs' version of that

25 test, then alter ego liability would not be a high burden.

79

It would be a low burden.  It would be relatively common and ordinary, and it would not be the extreme remedy that it's called in the case law, and it would not be under exceptional circumstances, as it would be under the case law.

The Plaintiffs' version of injustice would be completely at odds with the fiduciary shield doctrine cited by the Court in the tentative ruling.  That's a doctrine that shields officers, directors, fiduciaries from personal liability for actions taken in their official capacity, when -- and the corporations have acted, and they would be shielded both from liability and from personal jurisdiction, and what those fiduciary shield cases say -- exceptions are very rare.  One of them is alter ego.  That's at issue here, but, if it's broadened out improperly, it would seriously weaken the fiduciary shield doctrine and be at odds with Ninth Circuit law.

So, now, turning to the facts here, when we look at this question of whether the Plaintiffs have met their burden to show acts of bad faith that caused a fraud on Plaintiffs, you have to look at the undisputed facts here, that the companies at issue were profitable and well capitalized throughout the relevant period, they were not hiding or stripping assets, and that there is no allegation that the Defendants did anything to make these companies

80

1  undercapitalized, insolvency, or otherwise unable to pay a

2  judgment.

3          According to the Plaintiffs' own complaint,

4  hundreds of millions of dollars of capital were -- was

5  injected into the company by the majority shareholder, Mr.

6  Bergmair -- that's alleged in the complaint, and not

7  disputed here -- and that the evidence also shows that the

8  substantial debt that we've heard about this morning was,

9  over time, not just paid, but paid down over time, during

10 the relevant period.

11         The principal balance was reduced over time,

12 making the companies have more equity and more valuable

13 (sic), the very opposite of things that individual

14 Defendants accused of bad faith and trying to, you know,

15 render companies undercapitalized and insolvent would do.

16 The companies were profitable, and there's really no dispute

17 about that at all.  The company had audited financial

18 statements by global reputable auditors, and there's no

19 question, no dispute, no evidence that those audited

20 financials are anything but accurate and fairly done.

21         The Plaintiff suggests that there are fact issues

22 here of various kinds, and Mr. Bowe talked about some of

23 them, about how the underlying entities were structured, how

24 money moved between the entities.  I think it could be

25 fairly said that all of those fact issues went to the unity

81

1  of interest and ownership test.  They did not go to whether

2  these companies, during the relevant period, were adequately

3  capitalized, whether they were solvent, whether they'd be

4  able to meet a debt, whether they were profitable, whether

5  they had greater revenue than expenses, and so forth.  They

6  were all about how, exactly, these companies were

7  structured, and for what reason.

8       We would submit that the evidence is clear, and

9  would be clear if we had to reach the unity of interest

10  prong, but we don't have to, that the company was organized

11  in an entirely appropriate way, based on legal advice,

12  accounting scrutiny, audited financial statements,

13  inter-company books and records, that it was all fairly

14  garden variety of the way a profitable international

15  companies work.  We don't have to reach those issues.  As I

16  see it, the factual disputes that were even -- it was

17  difficult to discern them.  But, to the extent I could

18  discern them, they seemed to be related to unity of

19  interest, not to this specific bad faith act to cause an

20  injustice.

21       To take one example, there was argument about this

22  alleged scheme to avoid tax liability.  There's no evidence

23  for that whatsoever.  There's plenty of contrary evidence.

24  Lawyers and accountants were extensively involved, as the

25  Plaintiffs themselves allege in their complaint.  There were

82

audited financial statements, not a single ruling or
judgment or action by any tax authority around the world,
the United States, Luxembourg, any other country to suggest
there was anything fraudulent or improper from a tax
standpoint.

          No one has said there was a fraud, except
Plaintiffs' counsel pulls it out of the air and says, "It's
a tax fraud scheme." And I would just add, even assuming --
it's not true, but, even assuming there were a tax fraud
here, your Honor, if anything, it would leave substantially
more money in the company -- there are revenues, profits in
the company -- to meet a judgment.

          I want to say just a few words about this <u>Las
Palmas</u> case that was addressed briefly this morning.
Plaintiffs' counsel continues to mischaracterize both the
holding and relevance of that case. That case involved the
sale of a shopping center, and there allegations of fraud in
connection with the sale. The issue in the case was
substantive liability, not personal jurisdiction. The case
was decided under the single enterprise theory, not under
the unity of interest theory. It involved sister companies,
not individual Defendants, not the two-part test that
controls here.

          And in that case, there was an unusual posture,
very different from this one. It was after trial. There

83

was a judgment in the Plaintiff's favor, and there was an

issue of alter ego among potentially liable corporate

Defendants, and in that case, it was crystal clear that

there was a specific requirement to prove specific fraud

against specific Plaintiffs.  It wasn't just some sort of

vague, nebulous sense of wrongdoing.  It was very -- there

had to be a showing of particular acts that worked as a

fraud and injustice on a particular Plaintiff.

        The specific findings in that case were that alter

egos -- that the alter ego entities, quote:

        "Formed a single enterprise for the

        purpose of committing a fraud against

        the buyers."

        That was the finding of the Court.  It could not

be farther removed from the facts and posture of this case.

That's at page 1250 of the ruling, and the Court made a

specific finding that the entity at issue in the case was

undercapitalized.  So there were specific findings, and

particular facts and circumstances that make it very

different from the sort of nebulous sense of injustice that

is being bandied about here.

        I want to address the issue once more -- I will

try not to belabor it -- of this alleged unfairness, totally

unfounded allegation, this alleged unfairness from the

Defendants' reference to and partial reliance on the 2023

84

1  sale of stock agreement.  The parties agreed during

2  jurisdictional discovery that the relevant period was

3  through mid-2021.  That was after significant motion

4  practice, disputes over discovery, rulings by the magistrate

5  judge, and agreement among the parties.

6          The jurisdictional discovery then went forward.

7  There were multiple depositions, a day-long deposition of

8  Mr. Antoon, Mr. Tassillo, Mr. Bergmair, two days of Mr.

9  Andreou, and some other deposition practice, as well,

10  100,000 pages.

11          THE COURT:  But is it correct that that's just in

12  the Fleites case?

13          MR. SACK:  It's in the Fleites case, but the

14  parties agreed here, your Honor.  We agreed to amend the

15  protective order, that all of that discovery applied to the

16  14 other Defendants.  That didn't come out at the last

17  hearing.  We put it in our supplemental briefing.  The 14

18  other Plaintiffs have had full access and reliance upon all

19  of the Fleites discovery.

20          In this -- in the 14 other cases, Plaintiffs'

21  counsel asked to be able to use that discovery.  The

22  Defendants consented.  The protective order was amended.  No

23  other discovery was sought for the 14 other Plaintiffs, no

24  additional jurisdictional discovery.  That was the request,

25  and we said yes, and the Plaintiffs have relied on that

85

1 discovery in their briefing for the 41 other Plaintiffs'

2 cases that are before your Honor.

3         So the way the 2023 agreement came up, again, is,

4 during the depositions of the individual Defendants, they

5 were asked about their sale of stock that wasn't hidden, by

6 the way.  There were public announcements.  It was in the

7 news about their sale of stock.  They were asked about it.

8 I think the deposition testimony from Mr. Antoon and Mr.

9 Tassillo took up about 65 pages of deposition, answering

10 questions about the 2023 agreement.  There was a dispute

11 about whether that agreement was relevant and should be in

12 discovery, and should be at issue on the jurisdiction

13 issues.  Plaintiffs asked for the documentation of that

14 agreement.

15         Again, the Defendants agreed to produce that.  We

16 didn't agree to change the parameters of discovery

17 altogether, but we agreed to produce that document, at the

18 Plaintiffs' request, no sandbagging.  How could there be a

19 sandbag if the Plaintiffs asked for the document and got the

20 document?  They asked the questions at the deposition, and

21 they got answers from Mr. Antoon and Mr. Tassillo.  In our

22 view, respectfully, your Honor, that doesn't open the door

23 to new and irrelevant issues, given there has to be some

24 closure on the issue of personal jurisdiction, and the

25 parties agreed, and the litigation has been premised on the

86

1 limitation as of mid-2021.

2          And, by the way, it's not the Defendants who are

3 saying this agreement is central to the issue, the stock

4 sale agreement.  The Plaintiff said it was central to the

5 issue.  But that shouldn't be used to bootstrap into "Let's

6 now get to take more discovery, without any time limit, on

7 an ongoing basis."  I think it would just vitiate the

8 significance of the personal jurisdiction test here,

9 particularly for foreign individual Defendants protected by

10 the fiduciary shield here.

11          THE COURT:  But I guess -- so I can understand why

12 the parties would agree that, for liability purposes, the

13 end of the period is 2021.  I understand that, but it seems

14 like there's a separate question.  If they -- I understand

15 it this way procedurally.

16          If they raise an allegation that the MindGeek

17 Defendants are insolvent, then it is -- for personal

18 jurisdiction purposes, it is incumbent upon you to at least

19 submit a fact that says that fact is not true.  You have to

20 put that fact in controversy.  That's your burden, and then

21 the burden shifts back, I believe, to the Plaintiff, to

22 either put in contrary evidence to support the allegation or

23 at least point to something that creates a genuine issue of

24 dispute, right?

25          MR. SACK:  I would -- I apologize, your Honor.

87

1          THE COURT:  No.  I just -- let me finish the

2    thought.

3          MR. SACK:  Yes, please.  I apologize.

4          THE COURT:  But the issue for that analysis is,

5    right now, are the MindGeek Defendants insolvent, because --

6    not in 2021 -- because I can give you a hypothetical

7    circumstance where liability ends in 2021, but, in 2022, the

8    Defendants go through all sorts of corporate shenanigans

9    trying to shield from liability for that contact that

10   happened -- that ended in 2021, right?

11         So it seems to me that the question for this case

12   right now is -- I mean, I understand Mr. Bowe doesn't think

13   this is the question, but I guess my question is, are the

14   MindGeek Defendants insolvency right now?

15         MR. SACK:  Well, they are not, but I want to begin

16   with the first link in that chain that your Honor just laid

17   before us.  That is that there was an allegation of

18   insolvency.  It needs to be a well-pled allegation of

19   insolvency, not a conclusory allegation, not "It's

20   self-serving.  It serves my interest to say, 'Insolvency,'

21   so I'm going to say, 'Insolvency,' and that generates

22   needless discovery."  There has to be a well-pled fact or

23   set of facts that would allow that even minimal inference to

24   be drawn.  I've not heard any here, that there's any

25   well-pled allegation.

88

1          These companies are still in business.  There are

2   a thousand or more employees.  The allegations in the

3   complaint about being in a multi-$10,000,000,000 industry

4   are the same.  They are still a dominant player.  They are

5   still generating a lot of revenue.  They are still highly

6   profitable.  There is no contrary evidence or genuine

7   allegation, other than a speculation now, given the

8   losing -- given that the Plaintiff is losing on this issue,

9   because of the way the issue has been litigated to date.

10  There is nothing well pled or alleged to that effect.  So,

11  if there were such an allegation, we'd address it.

12          Now, even assuming there was an allegation, what

13  we have is a functioning company that's still a dominant

14  player, and we have a company where the shareholders, Mr.

15  Antoon, Tassillo, and Bergmair, sold their stock for

16  hundreds of millions of dollars.  Antoon and Tassillo

17  testified they've been paid pursuant to that agreement, so

18  there are new owners who are operating the company.  They've

19  been paid, and there's absolutely no evidence that these

20  companies are not profitable, solvent, operating in a way

21  similar to the way they operated before that.

22          And jurisdictional discovery, as a practical

23  matter, went beyond 2021, because of questions that were

24  asked, because of documents that were provided at the

25  Plaintiffs' request, and those documents show -- do not show

89

1  insolvency.  They show solvency and companies functioning,

2  and there's nothing, in our view, that would be well pled or

3  well alleged, that would trigger the chain, that would start

4  that chain of reasoning that your Honor suggested, in our

5  view.  Otherwise, we could be here for years unending, and I

6  just think, if personal jurisdiction -- if a test is

7  actually going to be applied, particularly to foreign

8  Defendants, particularly on the, at best, highly attenuated

9  basis that's alleged here, that there has to be closure for

10 that, and we don't have that record, to keep this open

11 indefinitely.

12         And, again, I would turn to your Honor's

13 statements in the tentative ruling on page 22, which is,

14 even accepting that there was something improper about that

15 shareholder agreement, your Honor wrote that:

16         "The MindGeek entities are and have

17         always been adequately capitalized

18         during the relevant period."

19 Your Honor goes on to say:

20         "This evidence squarely forecloses any

21         suggestion that corporate form has been

22         abused to shield the MindGeek entities

23         from liability, but the jurisdictional

24         record tells a different story.  The

25         relevant MindGeek entities remain

90

1   solvent, capitalized, and able to meet

2   their needs."

3       I would submit, your Honor, that nothing has

4   changed since May 7, since the issuance of the tentative

5   ruling, other than our effort to just show that the

6   Plaintiffs' reading of the law and reading of the cases is

7   incorrect, and that the Plaintiffs' speculation about facts

8   is unreliable and should not be relied upon here to keep

9   this process going further.  There's no injustice.  There's

10  no showing of injustice.  There's no unity of interest,

11  either, but the Court need not reach that issue here, given

12  the record.

13      Thank you, your Honor.

14      THE COURT:  Thank you very much.

15      MR. WHITE:  Thank you, your Honor.  My name is

16  Ronald White, again, on behalf of Mr. Bergmair.

17      Let me just first add a couple of points to what

18  Mr. Sack said just in response to your questions in the last

19  few minutes, and I'm going to address Mr. Bowe's comments.

20      Your Honor asked about the other Defendants and

21  their use of the Fleites jurisdictional discovery.  Not only

22  have they had access to it on this motion, right, just --

23  their motion to dismiss is being briefed just like Ms.

24  Fleites' here at this hearing.  Their briefs expressly

25  incorporate the Fleites jurisdictional discovery materials,

91

1  cite all the Plaintiffs exhibits that Ms. Fleites submitted.

2          If you look at the narrative of their briefs, they

3  discuss the exact same issues that they do in the Fleites

4  brief, using all the Fleites jurisdictional discovery

5  material.  So it's not like they're somehow different.

6  Like, in this motion, they have submitted the exact same

7  documents, and relied on the exact same arguments as Ms.

8  Fleites.  So they're not in need of any future -- further

9  discovery.

10          On the issue of the sort of alleged unfairness,

11  you know, Mr. Sack pointed out that Plaintiffs were the ones

12  who sought these 2023 documents.  They argued -- eventually,

13  your Honor, Defendants produced them, but, at a certain

14  point while we were discussing that issue, the Plaintiffs

15  applied to the magistrate judge for an expedited briefing

16  schedule.  But the Plaintiffs' briefs, your Honor, tell a

17  very important story.

18          In that brief, or in the filings that they made,

19  they argued that these 2023 documents were, quote, "highly

20  relevant to the Court's jurisdictional and alter ego

21  analyses," because they were "critical," Plaintiffs' words,

22  "critical," to the issue of enforcing a judgment against

23  insolvent or uncapitalized entities.  That's ECF Number

24  356-2.  Another one, ECF Number 356, they said it was

25  "Highly irrelevant to the ability of the named MindGeek

92

1  entities to satisfy any potential judgment."

2          So, your Honor, there's simply no way to square

3  those statements to the Court with their current argument

4  that "Oh, 2023 is totally irrelevant.  We had no idea that

5  the Plaintiffs wanted to" -- or "the Defendants wanted to

6  rely upon that."  They're the ones who argued to the Court

7  that it was critical to the analysis.  Your Honor, the only

8  thing that's changed is, now the Defendants (sic) got the

9  documents, they don't say what they want it to say, and so

10 they tell you to disregard it.  It just doesn't make any

11 sense.

12         So, your Honor, let me address a couple of Mr.

13 Bowe's points.  First, on the process, in your Honor's

14 question just recently, just moments ago, you described the

15 process, right?  So the Defendants have provided

16 declarations and provided evidence that contradict the

17 allegations.  Plaintiffs' burden is to come forward with

18 evidence, not allegations, not rhetoric, right, evidence, a

19 document, testimony, that substantiates their alter ego

20 argument.  They have the burden of proving personal

21 jurisdiction.

22         They took extensive discovery, depositions,

23 100,000 pages, letters rogatory, requests for admission,

24 third-party subpoenas.  They conducted a scorched-earth

25 discovery for an entire year, your Honor, and keep in mind,

93

your Honor, they got reams of internal contemporaneous
financial information from MindGeek.

As I mentioned at the last hearing, your Honor,
they got these monthly financial reports, some of which were
submitted to the Court in connection with this motion.  I'd
invite your Honor to take  look at them.  They're
exceedingly detailed Excel spreadsheets.  You can slice it
and dice it a million different ways for every company,
every dollar going in and out, and those are real-time
contemporaneous internal documents.

So all that raises the question, your Honor, so,
if the burden is on the Plaintiff to come forward with
evidence, and they argue that this company was in insolvent,
whether it was in 2021 or 2023.  Where is the document?
You'd think they'd say, "Oh, your Honor, it's right here.
It's Exhibit whatever.  It shows this, and it shows how
they're insolvent."  There's no such document for either '23
or '21.  So let me take both of them.

For 2023, the one and only fact, one and only
fact, that they alleged in support of their theory was that
no -- this sale was a sham because no one got paid any
money, which turned out to be totally false.  It was
contradicted by the allegations -- by the discovery that
they elicited, and then this morning Mr. Bowe acknowledged
that yes, they did get paid.

94

1        So, your Honor, what's left?  Well, your Honor's

2   tentative opinion describes it well, that the Plaintiffs'

3   arguments amount to nothing more than conclusory allegations

4   that are directly contradicted by evidence and affidavits

5   Defendants produced as part of jurisdictional discovery.

6        So let's look at the process.  On 2023, Plaintiff,

7   "Where's the beef?  Where's the document?"  Okay?  They have

8   none.  Your Honor has already found that.  Okay.  So now

9   let's look at 2021.  So that's the period that Plaintiffs

10  say now that's really what they were aiming at.  That's the

11  point at which solvency should be measured.

12       So their own exhibit, Plaintiffs' own Exhibit 73,

13  shows that MindGeek made hundreds of millions of dollars in

14  2020.  So the end of the year, December 2020, just five and

15  a half months before they filed this lawsuit, in that year

16  alone, MindGeek made hundreds of millions of dollars.

17  MindGeek's audited financials, audited financials, from 2014

18  through 2019, which were produced to the Plaintiffs in

19  discovery, they similarly showed annual profits of hundreds

20  of millions of dollars, and the figures from those

21  financials are excerpted in a chart in the Andreou

22  declaration, at paragraph 30.

23       So that means that, for every single year, for

24  seven years leading up to the filing of this lawsuit in

25  2021, MindGeek made hundreds of millions of dollars.  So how

95

could they possibly argue that the company was insolvent as
of June of 2021, and what's the document that contradicts
that?  Where is it?  Like, we've had hundreds of pages of
briefing, hours of arguments.  There's simply no document.
So, if the Court follows the process that is laid out in the
cases of how this is support to work, Plaintiffs have failed
to meet their burden on that.

So let me look -- discuss briefly, your Honor,
their insolvency arguments.  Mr. Sack made the point that
there was no bad faith conduct here by the individual
Defendants.  One point I want to emphasize is, remember,
alter ego is an individual analysis.  You can't just paint
with a broad brush.  So, with respect to Mr. Bergmair, the
question is, well, did Mr. Bergmair undertake any sort of
bad faith conduct that shows he was trying to evade
liability, you know, through the -- behind the corporate
form?

But, remember, as the complaint concedes, he
injected hundreds of millions of dollars of his own money
into this company.  He took personal dollars out of his
pocket and put them into the company, where they were
subject to claims like this, for potential Plaintiffs
against the corporation.  Similarly, MindGeek, as Mr. Sack
mentioned, paid down their debt, from hundreds of millions
dollars, from 2013 to when the individual Defendants left

96

1  the company, in '22 and '23.

2        So, your Honor, think about it.  If you -- if the

3  Defendants were trying to set up a company where they were

4  going to hide behind the form of the corporation to evade

5  liability, you would keep the company undercapitalized and

6  overly leveraged.  They did the opposite, and Plaintiffs

7  have no argument for that.  There's just simply no response.

8        So Plaintiffs' two arguments, your Honor, on

9  insolvency, Mr. Sack dealt with one, and then there's

10 another, as well.  So Mr. Bowe this morning cited paragraphs

11 of the complaint.  Those paragraphs go to the tax scheme,

12 the so-called "tax scheme," but all of that is completely

13 irrelevant because, as your Honor's question this morning

14 indicated, that would have meant the companies were better

15 off, they paid less taxes than the Plaintiffs think they're

16 supposed to, and nobody, nobody, not the IRS, no one in the

17 world other than Plaintiffs sitting here, have ever, ever

18 said that this is actually a tax scheme.

19       The second argument was that the company -- that

20 Mr. Bowe made this morning -- was that the companies were

21 insolvent from their inception.  With all due respect,

22 that's rhetorical nonsense.  They had a big loan, and they

23 had to pay it down over time.  That's like saying everyone

24 who ever took out a mortgage is functionally insolvent

25 because they can't pay it back on day one.  The definition

97

1  of "solvency" is you can pay your debts as they come due.

2  So the idea that, because they got a big loan in 2013,

3  they're insolvent now for this purpose, is ridiculous.

4        So, your Honor, finally, let me just address the

5  case law.  So their argument essentially, as Mr. Sack said,

6  reads the insolvency element out of the alter ego test, and

7  their --

8        THE COURT:  Well, I think I agree with him that

9  it's not necessarily insolvency is -- by itself is an

10 element.  I think it's part of the injustice element, and it

11 is a way to prove injustice.  So I think, hypothetically

12 speaking, there might be an alter ego finding in a case that

13 doesn't involve insolvency, per se.  I'm not sure that I've

14 seen that case, but I think that, the way the test is at

15 least laid out, that's theoretically possible.

16       MR. WHITE:  Well, your Honor, I'm not sure I've

17 seen the case, either, and the Plaintiffs don't cite any, so

18 let me just focus on that.  So their argument that's on page

19 three of their supplemental brief was "Well, there's no

20 cases that find" -- that there are cases, rather, that find

21 injustice without a showing of undercapitalization or

22 insolvency.

23       So they cite four cases.  The first two of them

24 were Ninth Circuit cases, so I think, "Well, okay.  Maybe

25 that's relevant."  If you look at them, your Honor, both of

98

1  them apply -- this is the <u>Wolf</u> and the <u>Tau Antique</u>

2  (phonetic) case.  Both of them applied Montana state law,

3  have nothing to do with our issue.  The second two, <u>United</u>

4  <u>States v. Boyce</u> (phonetic) and <u>Prompt Staffing v. U.S.</u>, are

5  in a unique factual circumstance.  So, in there, the IRS is

6  trying to do a reverse piercing.  They're saying -- against

7  individual taxpayers who are alleged to have taken their

8  personal assets to avoid a tax liability and given it to

9  some corporate -- corporation that they control.

10          And so there, your Honor, there was already a

11 finding -- there was already a lack of payment.  In other

12 words, the IRS had assessed the taxes.  The individual

13 taxpayers had an obligation to pay, and they stiffed the

14 IRS.  So there was already an unpaid obligation.  Here the

15 whole issue we've been talking about is "Can the company pay

16 some future obligation?"  That had already happened in those

17 cases.  The taxpayers had already stiffed the IRS, and

18 that's why there wasn't the separate finding of insolvency

19 or undercapitalization.

20          But, to the point about the reading the injustice

21 element out, there's a number of cases that are cited in our

22 brief, Mr. Bergmair's brief, our opening brief in the

23 Fleites matter, that -- where the courts rejected the exact

24 argument that the Plaintiffs make.  They articulate the

25 injustice in the same way.

99

1          One, for example, was called <u>Fru-Con</u>

2  <u>Construction</u> -- it was cited in our brief at page 19 -- and

3  they make the same argument, "Well, because you didn't

4  observe the corporate formalities, therefore, it would be an

5  injustice not to -- you know, not to find alter ego."  And

6  the courts used almost the exact same words that your Honor

7  used in your question this morning, that:

8              "If this were sufficient, the injustice

9              prong of the test would collapse into

10             the unity prong and become superfluous."

11         There's several other cases cited in our brief,

12  your Honor, the <u>Sun Group U.S.A.</u> case, at page 24, the

13  <u>Shimmick Construction</u> case, at page 19, and there's others,

14  as well, that hold similarly, that reject the argument that

15  the Plaintiffs are making here, and their articulation of

16  injustice.

17         And the other argument, I guess, your Honor, is

18  the Plaintiffs ignore that courts have ruled repeatedly that

19  where the remaining corporate Defendant can pay a judgment,

20  then there can be no injustice, and they argue, amazingly,

21  that there's no such case, but, in our brief, your Honor, in

22  Bergmair's opening brief, we cited eight separate cases that

23  said that.  They're in a long string cite on pages 19 and

24  20, and there's half a dozen others that we cite, as well,

25  your Honor.  I can give you the citations, as well.

100

1         For example, again using the <u>Fru-Con</u> Construction

2 case, they ruled there, where the corporate Defendant

3 remaining in the case could cover any judgment, quote, "This

4 fact alone is sufficient to negate the imposition of alter

5 ego," and there's others cited in our brief, as well.

6         The last point I would make is in response to your

7 Honor's question to Mr. Sack right at the end about "Should

8 we have some additional discovery on current solvency?"  The

9 short answer, your Honor, is no, because it's irrelevant,

10 because, even if, even if, discovery would show that

11 post-2023 or 2025, or whatever period you use, that MindGeek

12 was insolvent, that doesn't mean that, therefore, there's

13 injustice.  The courts have ruled that just because a

14 Defendant can't pay a judgment doesn't mean it's an

15 injustice.

16         The converse is not true.  If the remaining

17 Defendant can pay a judgment, it's almost as if a trump

18 card.  It's like, "Well, then it's no harm, no foul," and

19 you can collect from the company, and there's no injustice.

20 But, even if you can't, the cases are clear that if the

21 Defendant can't pay, you have to show some bad faith.  That

22 alone is not injustice.

23         And here, as I just went over, there's no bad

24 faith conduct.  They put -- they didn't keep the company

25 undercapitalized.  They didn't over-leverage it with debt.

101

1  There's just -- so, because they can't show the bad faith

2  conduct, there's no reason why you need to explore it any

3  further.  That's the end of the matter.

4          Unless your Honor has questions, that's it for me.

5          THE COURT:  I don't.

6          I actually -- I have to take a brief work-related

7  call.  So let's take a 15-minute recess, and then I'll come

8  back to conclude.

9          THE CLERK:  All rise.

10      (Proceedings recessed briefly.)

11          THE CLERK:  Please remain seated and come to

12  order.  Court is once again in session.

13          THE COURT:  All right.  We're back on the record

14  in the various MindGeek hearings.  All counsel are present.

15          Mr. Bowe, you're standing.

16          MR. BOWE:  May I respond, your Honor?

17          THE COURT:  No.  I would like to hear from the

18  others first.

19          Mr. Tulumello, I have some questions for you,

20  actually.  When -- obviously, you can say whatever you want,

21  but what do you make of this concept, the argument that

22  Plaintiffs' counsel made, about the idea that if there is

23  enough knowledge and continued conduct, at some point, that

24  becomes circumstantial evidence of intent, and intent to --

25  and, in fact, you know, aiding the criminal enterprise?

102

1          In fact -- and so I would posit it as, at some

2   point, Visa had enough information, the argument would go,

3   that what they were doing by enabling the MindGeek

4   Defendants to process payments -- that what they were doing

5   and what they were profiting off of was, you know, sale of

6   child pornography.

7          Now, we can dispute, you know, the factual support

8   for that, but, at this stage, at the motion to dismiss

9   stage, have they alleged enough to suggest that that case is

10  true, and, I guess sort of separately, not -- it's not

11  exactly the same issue, but, sort of separately, unlike the

12  utility company, you were actually -- your client was

13  actually profiting from MindGeek's profit.

14         In other words, the utility company is just -- you

15  know, is just paying a rate, but you were actually sort of a

16  participant, in some sense, in a way that the lenders

17  weren't, right?  The lenders are getting their fixed rate of

18  return, and they -- you know, yes, they had an interest in

19  the enterprise being profitable, so that they could

20  re-collect, but your client actually had a stake in the

21  individual success, you know, in the individual successes of

22  the MindGeek websites.

23         So, if you could address those, please, and then,

24  obviously, feel free to respond to anything else you'd like

25  to.

103

1          MR. TULUMELLO:  Okay.  Thank you very much, your

2    Honor.  I think, as a starting point, the essentially

3    proposition of law is that knowledge, however deep, is not

4    sufficient to plead the additional two elements that are

5    required for a conspiracy, and, you know, that is an

6    elemental proposition of law that courts apply in the TVPRA

7    and every other context.

8          Deutsche Bank, Judge Rakoff's (phonetic) opinion

9    on 12(b)(6), the Bernhardt (phonetic) case that your Honor

10   cites in the opinion, Kemper v. Deutsche Bank, Judge

11   Breyer's (phonetic) decision in Craigslist v.3Taps, all of

12   those cases involved explicit recognition of acute and clear

13   knowledge, but were dismissed at 12(b)(6) on the grounds

14   that the other two Halberstam factors that we talked about

15   this morning were not pleaded.

16          So what I think it would do is essentially invite

17   the Court into the very air we discussed this morning, which

18   is to erode the distinctions between the knowledge element

19   and the other two required elements, and, you know, the sort

20   of plea as I hear it is that "Well, we cannot plead that

21   Visa is a perpetrator.  We cannot plead that Visa is a

22   beneficiary.  We cannot even plead that Visa is a

23   conspirator.  We can prove one element, which is knowledge,

24   but please let us get to discovery so we can try and prove

25   the other two elements," and that is just not how 12(b)(6)

104

1  or the pleading standards work.

2        We've long since retired the <u>Conley v. Gibson</u>

3  standard, where a Plaintiff can say, "Well, any set of facts

4  could arguably prove, you know, our complaint."  In <u>Iqbal</u>

5  and <u>Bell Atlantic v. Twombly</u>, the requirement is to

6  plausibly plead each element of a claim, and they haven't

7  done that, for the reasons set forth in the tentative.

8        And, you know, to come back to the money-sharing

9  distinction, your second question, again, that is no

10  different than any buyer-seller relationship.  There is a --

11  there's money changing hands.  There is a transaction.  The

12  participant in the buy-sell transaction is profiting from

13  it, and, as Judge Breyer observed, a buyer-seller

14  transaction doesn't come with the excess baggage of

15  conspiracy.

16        And in <u>Twitter</u>, the Supreme Court case, the

17  allegations were that Google itself was directly profit

18  sharing with ISIS.  In other words, there was ad revenue

19  that Google would split with the people who actually posted

20  the videos, and the allegation the Plaintiffs made in that

21  case was that the -- that Google was directly -- and the

22  other platforms -- but Google was not only profiting, but

23  sharing revenue from these terrorist-inspired videos.

24        So I don't think that the, you know, sharing of

25  revenue or the -- you know, the transaction fee that Visa

105

1  gets as part of the ordinary course of the business that it

2  runs for all merchants and all banks across the world allows

3  the Court to -- or Plaintiffs, rather -- to erode the other

4  two, you know, critical elements.

5          The other, I think, point that this risks leading

6  into is to say, "Well, Visa is unique and different from the

7  power company, because it's so critical to the success of

8  the venture," and I think that's -- you know, that is a

9  point that was, you know, really emphasized, that, you know,

10 it's critical, critical, critical, and 10,000,000 videos

11 went down afterwards, you know, and all the rest, and,

12 again, the Supreme Court, in reviewing the Ninth Circuit's

13 reasoning in <u>Twitter</u>, okay, which allowed the claims to go

14 forward, specifically said that the Ninth Circuit erred in

15 focusing primarily on the value of the Defendants' platforms

16 to ISIS, rather than whether the Defendants culpably

17 associated themselves with ISIS' actions.

18         And so I think the Plaintiffs argument about

19 criticality, materiality, the revenue split is all inviting

20 the Court to repeat that same error that the Supreme Court

21 pointed out, and, instead, in that same paragraph -- and

22 this is at 598 U.S. 504, 505 -- the Supreme Court observed

23 that the Ninth Circuit should have given much greater weight

24 to Defendant's arms-length relationship with ISIS, which was

25 essentially no different from their relationship with all of

106

their other users.

And so I think the -- what they do not have are well-pleaded, plausible allegations on the agreement or intent to aid. What they are trying to do is bootstrap knowledge to say, "That's sufficient," and knowledge coupled with context, the money revenue and how critical Visa allegedly is, and those two attributes, revenue sharing and being important to the bad guys, are specifically rejected in the cases. So I don't think that gets them, you know, past the -- sort of the reasoning that this Court set out in the tentative.

And then, you know, the other thing I really want to emphasize is that the reason the boundary is so important on secondary liability, especially on conspiracy, has to do with Pinkerton liability. Pinkerton liability is quite vast, right? And it's -- we, in theory -- if their theory is right, Visa would be liable not just for the 14 Plaintiffs that we have here, but any Plaintiff who -- any -- at any time came on and had their videos on MindGeek, before or after we joined the conspiracy.

I picked that up in the footnote of your Honor's tentative, right, that that -- which I hadn't focused on. That was a surprising aspect of the law. That is massive liability, and, again, in Twitter, Twitter says, if you got a result or a legal rule that's pointing in the direction

1  where it is going to make an arm's-length company

2  responsible or liable for effectively anything that this

3  other entity does, that's a tell that the boundary my be

4  crossed.  I'm paraphrasing there, but that is, in sum and

5  substance, how the Supreme Court, you know, closes its case.

6         And so, again, this is not a unique situation.

7  Salesforce, Deutsche Bank, the, you know, various and sundry

8  hotel cases, they all show that these cases can be pleaded

9  and survive a motion to dismiss with well-pleaded facts, but

10  we just don't have that here, and I think, your Honor, I

11  really don't have more to add than that the tentative now

12  aligns this Court with the decisions of Deutsche Bank,

13  Craigslist, Kemper, Twitter, Bernhardt, and it is no longer

14  the very first case to accept, you know, this elastic

15  alleged liability, and it shouldn't be the first.

16         THE COURT:  Okay.

17         MR. TULUMELLO:  Thank you.

18         THE COURT:  Thank you.

19         MR. PEARL:  Your Honor --

20         THE COURT:  I would.

21         MR. PEARL:  -- would you like to hear from the

22  lenders?

23         THE COURT:  Sure.

24         MR. PEARL:  To your Honor's question about what

25  level of knowledge is sufficient, Judge Carney addressed

108

1  this exact question in his prior opinion.  If you look at

2  Fleites, 617 F.3d at 1168, it says, even if Google knows

3  that its search engine is being used to drive traffic to a

4  website allegedly teeming with child porn, and thereby

5  indirectly helps that website financially benefit from its

6  illicit content, it would not have provided a tool through

7  which the crime is completed.  So we think Judge Carney got

8  it right on that point, that, even if you had knowledge that

9  the site was teeming with CSAM, that would not be enough.

10         Here, building on Mr. Tulumello's point, there's a

11  reason why there are no cases cited by Plaintiff, because,

12  if you tease this scenario out of what this would mean for

13  lender liability, any lender that lends to a pharmaceutical

14  company that's been sued for some type of product liability,

15  and found liable for product liability, and then continued

16  to lend to that pharmaceutical company, would then be

17  subject to conspiracy allegations, that it joined and

18  financed this tort, and there are no cases that hold that.

19  There are no cases that pull lenders into those

20  circumstances.  So, as Mr. Tulumello said, I don't think

21  this should be the first.

22         If you go back and you read Plaintiffs'

23  allegations in this case, what they amount to is knowledge

24  and a failure to act, and under the Twitter case and its

25  progeny, that's not enough.  I want to read one of the

109

paragraphs.  It's paragraph 279.  It says:

      "At the time that this growing public

      awareness began, Redwood and its

      syndicate had long known these facts and

      these reports to be true, yet they did

      nothing to address the issue, did not

      pull their financing, and instead

      supported MindGeek's insidious public

      gaslighting campaign, denying the truth

      of these claims."

      It goes on to say:

      "The utter lack of response from the

      effective owners and controllers of the

      business during this period demonstrates

      that they were neither surprised nor

      unhappy about the practices."

      It's all about Redwood and the other lenders failing to declare a default and take over the company.  But what I read to your Honor was, when the Kristof article comes you, Redwood does exactly that.  It sends them a letter with a notice of intent to default, and what it require?  And this is highly probative towards Redwood's state of mind.  It requires the very thing that Plaintiffs said we should require, which is compliance with Section 2257 and the record keeping, which was also in the 2013 and

110

1  2018 agreements.

2          And Mr. Bowe referred earlier to the deferred

3  prosecution agreement between DOJ and MindGeek.  That was a

4  30-month investigation, and what did the DOJ require at the

5  end of that 30-month investigation?  They required the

6  appointment of a monitor.  That's exactly what Redwood

7  required.  So the allegations in the complaint, as your

8  Honor accurately summarized in the Visa tentative, amount

9  to, at most, knowledge.  We obviously vigorously contest

10  those knowledge allegations, but, even if you take those as

11  true, they do not indicate any intent or meeting of the

12  minds to enter into an agreement.

13          And in your Honor's tentative, at page 35, you

14  say, "Each Defendant has to pursue one part of the

15  conspiracy."  Redwood didn't pursue any part of the

16  conspiracy.  Redwood provided the same thing it provides to

17  any other borrower, which is financing, and Redwood made the

18  same amount of money whether MindGeek got a lot of traffic

19  or not a lot of traffic.

20          So, for these reasons, your Honor -- go ahead.

21          THE COURT:  As long as it was solvent.

22          MR. PEARL:  As long as it was solvent, but, I

23  mean, I think the allegations in the complaint -- and my

24  colleagues over here have made the case quite

25  persuasively -- Plaintiffs, in their complaint, allege that

*Echo Reporting, Inc.*

111

1  this was a highly profitable business, you know, throwing

2  off hundreds of millions of dollars.

3          So your Honor is allowed to do two things, one,

4  think about the plausibility of the allegations under

5  Twombly, and, two, under Johnson v. Federal Home Loan

6  Mortgage, you're allowed to look at the documents that are

7  incorporated by reference in the complaint, and if they

8  directly contradict the allegations, like they do here,

9  which is Redwood actually requiring 2257 compliance, Redwood

10 actually -- and the other lenders -- requiring the

11 appointment of a monitor -- if the allegations of the

12 complaint are directly contradicted by documents attached,

13 under Johnson v. Federal Home Loan Mortgage, you're allowed

14 to dismiss on that basis.

15         So, you know, in sum, your Honor, I think Judge

16 Carney made clear, and your tentative confirms that, it

17 doesn't matter how much knowledge there is.  There have to

18 be facts that show an intent and a meeting of the minds to

19 accomplish this unlawful objective.

20         And to opposing counsel's point on discovery, this

21 is not a case where -- that just got filed.  This is a case

22 where there's been years of discovery that they -- it hasn't

23 been discovery on all issues.  I concede that.  But they

24 asked questions of these witnesses about Redwood and the

25 other lenders, and opposing counsel referred to those

112

responses, and what they say -- and I encourage your Honor to go back and read the deposition.

What Mr. Bergmair testifies in that deposition is he only talked to Redwood once or twice. So the idea that we were arm and arm, you know, helping to accomplish this unlawful objective is flatly contradicted by the transcript, and you should go ahead and go back and read that.

And, unlike Salesforce, we're not alleged to have done anything in addition. Like, Salesforce was at the table helping to -- helping the trafficker design their product to accomplish the unlawful objective. We were just providing money. Money is fungible.

So, for these reasons, your Honor, even if you take their allegations of knowledge as true, they still haven't pled, and can't plead, the necessary elements of intent and agreement.

THE COURT: Okay. Thank you.

Colbeck.

MR. ADAM: Thank you, your Honor. Colbeck is aligned with Visa and Redwood on the substance. I just have three really minor clarifications to make from Plaintiffs' argument.

First, counsel argued that the receipt of letters from NGOs and advocacy groups, and the New York Times article, can be used to infer agreement and intent. That's

113

1  wrong.  I think that goes to knowledge.  But, either way,

2  those letters were in 2020.

3        THE COURT:  Right.

4        MR. ADAM:  That's years after the exit of Colbeck,

5  right?  So Colbeck wasn't receiving those letters.

6        Counsel referenced the Bergmair deposition

7  testimony.  Again, we don't agree with the interpretation of

8  that testimony, but, if you look at page eight of our

9  Fleites motion to dismiss brief, we address that testimony

10  specifically.  It's talking about post-2020 conduct, again

11  well after Colbeck had exited.

12        Counsel said that Defendants were the tool that

13  MindGeek used to monetize CSAM, trying to borrow that

14  language from Judge Carney's decision, but there's no

15  alleged tool here being provided by Colbeck.  Plaintiffs'

16  case here is really simple as to the lenders.  It's that we

17  did due diligence, we loaned money, and we earned interest.

18        There is no affirmative conduct by Colbeck where

19  they allegedly engaged in -- that you can infer agreement or

20  intent to benefit from a sex trafficking venture.  At most,

21  what Plaintiffs are asking for here is that knowledge plus

22  neutral actions, like loaning money in 2011 and then loaning

23  money again in 2013, or inaction, is sufficient to infer

24  agreement, and it's not.  You know, reading directly from

25  your tentative in the Visa decision:

114

1          "Civil TVPRA conspiracy cannot be

2          triggered solely by knowledge and

3          inertia.  It requires affirmative

4          alignment with the venture's unlawful

5          purpose."

6          We don't have that here.  Thank you, your Honor.

7          THE COURT:  All right.  Thank you very much.

8          All right, Counsel.

9          MS. TABAKSBLAT:  Your Honor, you heard a lot about

10 this being a case about turning a blind eye.  This isn't a

11 case where we're resting on, you know, general media reports

12 or information about the sex trafficking generally.  This is

13 a case where the allegations are that each Defendant,

14 Redwood, Colbeck, Visa, had specific concrete information

15 about those sex trafficking activities, and they nonetheless

16 affirmatively elected to provide direct and material

17 support.

18          They're relying heavily on Twitter.  The Court's

19 tentative cites to Twitter.  This case is plainly

20 distinguishable than Twitter.  In Twitter, the Supreme

21 Court, in ultimately reversing the Ninth Circuit's decision,

22 said there were no allegations that Twitter helped planned

23 the ISIS attack.  There's no allegations that they

24 participated in that attack, or that they received any

25 financial benefit from that attack.

115

1            And then what did the Court note?  And I'm

2    directing you to page 500 of the decision.  It says:

3            "At bottom, then, the claim here rests

4            less on affirmative misconduct and more

5            on an alleged failure to stop ISIS from

6            using these platforms."

7            But then the Court says -- and this is, I think,

8    very critical, your Honor.  It says -- and for completeness,

9    I'll read the rest -- I'll read the next sentence:

10           "But, as noted above, both tort and

11           criminal law have long been leery of

12           opposing aiding and abetting liability

13           for mere passive nonfeasance."

14           But then it says -- and this, I think, your Honor,

15   is critical:

16           "To show that Defendants' failure to

17           stop ISIS from using these platforms is

18           somehow culpable."

19           So the just ignoring the red flags, as they're

20   saying here, could still be culpable, a strong showing of

21   assistance and scienter would thus be required.  In the

22   facts in Twitter, the Court said it wasn't there.  It wasn't

23   there because Twitter didn't provide the support needed, the

24   platform needed to actually plan or carry out the attack.

25   They merely provided a platform where there was posting to

116

1  solicit and to recruit those to join.  Eventually, those
2  people that would join years later, in a different context,
3  formed and they planned the attack.

4          That's entirely different than what we have here,
5  your Honor.  Here we have the two things that the Supreme
6  Court says.  We have this critical tool, the assistance, and
7  we have the scienter that the Court found.  We have those
8  elements.  You can base -- and with respect to Redwood and
9  Colbeck, and with respect to both the Defendants, we have
10 the affirmative decision to continue to directly profit from
11 this in the face of direct and concrete information of how
12 were they deriving these profits, and the fact that MindGeek
13 couldn't actually profit from the CSAM without both -- the
14 hundreds of millions of dollars.  Together they provide over
15 $700,000,000, and the credit card processing, which we know,
16 as soon as it was withdrawn, they immediately took these
17 videos down.

18         So, your Honor, before I just walk you through one
19 more time the direct link between this knowledge and the
20 tool and the running of this entity, and the direct way in
21 which they profited from it, I'll just make one other point,
22 which is, counsel wants agree (sic) it leads to distinguish
23 Deutsche Bank.  They said Deutsche Bank, all these cases,
24 hold that, absent -- that knowledge itself, under the facts
25 and circumstances here, where it goes so far, and the

117

decision to keep doing what you're doing is actually an
affirmative decision -- they hold that, as a matter of law,
that's not sufficient.

Your Honor, that's not what the <u>Deutsche Bank</u>
decision or any of those decisions tells.  In fact, what
Judge Riechoff (phonetic) held in <u>Deutsche Bank</u> was that
there was no intent and agreement to participate in the sex
trafficking itself, that Deutsche Bank, in processing these
payments, didn't evince an intent or an agreement to
actually sex-traffic any women, and what Judge Carney held
in his underlying decision here is that is not the venture
that's alleged in this case, and that's why it's so
critical.

The venture that's alleged here, and as your Honor
correctly recognized during the last hearing, is a venture
to profit from the sex trafficking, and what -- their
conduct, each of their conduct, in the face of this specific
concrete information, and their direct profiting, directly
from that CSAM, provides all the necessary elements that we
need at the pleading stage on these claims that are highly
circumstantial, that your Honor properly recognizes are very
infrequently proven by direct evidence, and to the extent
that there would be that direct evidence, it's uniquely in
the hands of the Defendants, and would require that
discovery.

118

1          So, just really quickly, your Honor, what is that

2    knowledge and that affirmative action that together provide

3    the allegations and inference that the Court needs to

4    sustain the claims at the pleading stage?  Colbeck and

5    Redwood provided more than $700,000,000 in loans to

6    MindGeek.  That money was provided to acquire, grow, and

7    operate the business.  Before doing so, they did extensive

8    due diligence, the type you would do before loaning that

9    type of money in that magnitude, into every aspect of the

10   business.

11         That due diligence revealed all the illegal

12   content on MindGeek's site before it provided the loan, the

13   business model to grow that business, based on an

14   unrestricted content model, the profit projections, the

15   website activity and how that was tied to projections, the

16   policies, tools, and practices to maximize the distribution

17   of that illegal activity as required to drive revenue.

18         They said that there's no dispute here that they

19   knew.  Your Honor already has found that that's sufficient.

20   All of this establishes that they knew before they made that

21   affirmative decision to provide that funding, without which

22   they couldn't grow this unrestricted content model.  They

23   couldn't profit from the CSAM.

24         And then what happened?  Following that due

25   diligence, they entered into financing agreements.  They put

119

1  those financing agreements in front of you.  They

2  cherry-pick from them.  They say, "Draw all these

3  inferences, without the full story."  But, even just looking

4  at those agreements themselves, what do they show your

5  Honor?  They show that they were entitled to extensive

6  reporting under those respective financing agreements, and

7  just some examples -- they're in the record.

8         We addressed it in our oppositions, but what are

9  some examples of what types of reporting?  Web site traffic,

10  access to Google Analytics of the types of content and

11  trends that were trending, notices of 2257 complaints -- so

12  any time there's a 2257 complaint that got reported to

13  Redwood and Colbeck -- and then notices of reports of all

14  user accounts that were suspended or canceled as a result of

15  user violations.

16         None of that is before the Court today.  We don't

17  know if they got reports every day, the volume of those

18  reports, what their reaction to those reports are, but we

19  know that just a simple Google search, as Visa did in

20  2020 -- within 48 hours, they were able to tell that the

21  entire platform was rife with illegal content.

22         And so what did they do?  They had this due

23  diligence, they had this reporting, and they re-upped.  They

24  increased their investment in 2013.  They sought to generate

25  additional, more profits from this illegal activity.  Again,

120

1  they did the same due diligence in 2013, and then those

2  agreements entitled them to the same reporting that they got

3  throughout.  They had -- the reporting provided complete

4  transparency into how the business was run, the financial

5  metrics, the same Google Analytics, the 2257 reports, and

6  the notice of user and suspended accounts.

7        They were informed, or should have been informed,

8  under those agreements, and that's a question of fact to

9  which we're entitled to discovery, as to whether or not the

10 very Plaintiffs in this action requested that their videos

11 be removed because they were minors.  All of that is subject

12 to the reporting that they were entitled to, and then, in

13 2017, Redwood made the decision, based on all this due

14 diligence and all this reporting, to increase their

15 investment again, and they didn't just want to increase it

16 and continue to -- they wanted to take Colbeck's share, as

17 well.  And so they paid Colbeck, and Colbeck earned the

18 benefits that Redwood could continue to share in this

19 enormous interest raise that they were receiving.

20        And then, in 2023 -- in 2020, when Nick Kristof

21 came out with his report, and Visa and Mastercard suspended,

22 Redwood could have declared a default.  They could have

23 immediately taken over the company, and Mr. Pearl got up

24 here and said that they could have, but that's not what they

25 did.  They sent a window-dressing letter, and they

1  actually -- as Mr. Bergmair testified, "They actually

2  increased our interest rate."

3          So counsel said -- and I think the Court alluded

4  to this idea -- that perhaps Redwood wasn't participating in

5  the profits in each actual transaction the way that Visa

6  was, but, in fact, they were.  First of all -- and this is

7  alleged in spades in the complaint -- they never would have

8  been able to obtain these type of exorbitant interest rates

9  if it was a purely legal business.  They understood that,

10  and that's why Redwood wanted a bigger piece of it.  That's

11  why they wanted to increase their investment, because it was

12  such a lucrative investment, and they were able to obtain

13  such high interest rates because they understood the

14  specific nature of that business.

15          They spoke to Antoon and Tassillo regularly.

16  Counsel got up here and he said, "Well, Bergmair testified

17  he only spoke to them once or twice."  Well, the testimony

18  is that they spoke to Antoon and Tassillo regularly.  They

19  had broad control rights over the company.  They could have

20  declared, at any point between 2011 and 2020, a default,

21  based on any of this reporting that they received, and of

22  the complaints by the specific victims in this case, and

23  they didn't.

24          Similarly, the complaint alleges, and your Honor

25  alluded to, that Visa, in April of 2020, was put on the

122

dirty list.  It also alleges they got thousands of demands,
thousands, from NGOs to executives at Visa, including its
CEO, demanding that Visa terminate its relationship.  Visa
didn't ask a single question.  They didn't do an
investigation.  They didn't suspend, like they did in 2020.
They continued to reap the benefit of every single credit
card processing payment for subscriptions and for
advertising.

They continued through that whole period, and
then, in 2021, when Mastercard came out, and they issued
this broad statement, Visa sort of followed suit, suspended
for a short period of time, and went back.  The continued
affirmative act of providing the critical tool, profiting
from it, and continuing to do so, this isn't just "We
weren't carefully reading the posts," like the Supreme Court
held in <u>Twitter</u>.  They said, "There's not really even an
allegation that Twitter was carefully reviewing the ISIS
posts."  This is not that.  They knew.  It was clear.  It
was explicit.  NGOs were begging them to stop, and they
didn't.

We're at the pleading stage.  It's in their hands.
All this Court needs to find today is whether, presented
with these facts, assuming they're true, and assuming
discovery proves it, a reasonable jury could conclude that
these Defendants intended and agreed to participate, based

123

1  on their knowledge and their continued years-long

2  participation.

3         To hold otherwise would essentially say you could

4  knowingly provide hundreds of millions of dollars and

5  hundreds of millions of benefits to a known trafficking

6  venture, and there's absolutely no liability for that.  I

7  don't think that's the law.  I don't think that's consistent

8  with the Court's questions here, and, respectfully, your

9  Honor, we believe that we get those inferences here.

10         Judge Carney found that we had established what we

11  need for that inference, and as long as one -- as long as a

12  reasonable juror could conclude that we've established those

13  elements here, their motions should be denied, and we should

14  proceed to discovery.

15         All the papers and the agreements and everything

16  they put in front of you, it's all bound with factual

17  issues, what they actually knew, what the correspondence

18  was, what they did in response to that, whether they

19  affirmatively agreed to move forward.  All of that is in

20  their hands.  We should get discovery on this record, when

21  they had that explicit knowledge and they kept doing it.

22  That's all we need here at the pleading stage.

23         THE COURT:  Okay.  Thank you.

24         Mr. Bowe, last word.

25         MR. BOWE:  I'm sorry, your Honor?

124

1          THE COURT:  Last word.

2          MR. BOWE:  It's beginning to sound not a lot like

3    Christmas, Judge.  It's beginning to sound a lot like

4    closing argument, and that sort of brings me full circle

5    where I started with your Honor.  I will try and be brief.

6          The alter ego issue, as all the cases say, is

7    highly fact-specific, and needs to be looked at in the

8    context of each individual set of circumstances, which is

9    what --

10          THE COURT:  But I'll give you one sentence.  What

11   is the injustice that is rendered by the unity of purpose in

12   this case?

13          MR. BOWE:  The injustice is precisely the

14   injustice that they talk about in Toho (phonetic) and all

15   the cases that I went over this morning, where the fact is,

16   it is, per se, unjust for somebody to completely and utterly

17   ignore, not operate, not function in any way according to

18   the corporate form, and then attempt to hide behind the

19   corporate form, which goes, your Honor, to your challenge

20   that Defendants, understandably, sort of embraced and then

21   tried to move on, which is "Aren't we just conflating the

22   two prongs?"

23          The answer is somewhat, Judge, at certain times,

24   but that shouldn't surprise or trouble your Honor because,

25   if you look at the tests, it's two-prong test.  Almost every

125

1  case, including Las Palmas, talks about two prongs, both of

2  the prongs, same prongs.  Mr. Sack said somehow it wasn't,

3  but they're the same prongs.

4           What they say is, among other things, Judge, you

5  could show unity of interest how?  Among the list is

6  commingling assets, a lack of capitalization, a diversion of

7  assets for personal use.  You can use that evidence to show

8  unity of interest.  They also say you could use those facts

9  to show it is unjust.

10          THE COURT:  Which of those facts do you have, Mr.

11  Bowe?

12          MR. BOWE:  We have -- well, we have unity of

13  interest, your Honor.  We have, I don't know, 150 pages of

14  allegations of commingling of funds, the ignoring of the

15  corporate form, the payment of dividends in all sorts of

16  ways that don't support the corporate form, and what we then

17  have is -- and so that's -- so you need that, and that can

18  also be a ground for saying that it is unjust if, as Toho

19  points out, quote:

20          "One such scenario of it being unjust is

21           where an individual owner incorporates,

22           but fails to treat as a separate entity,

23           and continues to operate as a sole

24           proprietorship.  Such liability will be

25           found to exist where there is such

126

1          interest that separation has ceased."

2          And that is what makes -- that is what our case

3   has.  The cases that I cited to you last time, the cases I

4   talked about this morning, Judge, are cases where the unity

5   of interest does conflate, because separation -- there is no

6   such thing as an entity and the people.  The three

7   individual owners here, we allege that -- we allege 150

8   paragraphs of allegations, none of which are directly

9   disputed, that show that these three individuals, who, in

10  theory, under the corporate form, should have had nothing to

11  do with this company, they were all UBOs.

12         They were the chief executives and chairmen of

13  this company, operating it on a daily basis, the quarterly

14  meetings, the annual meetings, all of that.  They weren't

15  supposed to do that under the corporate form, but they ran

16  it directly, personally, as if they owned it personally, and

17  when they were questioned, they had no idea.  They knew

18  there was a corporate form out there for tax stuff.  They

19  didn't know how it worked.  They didn't operate under it.

20  They just ignored it.  It didn't exist, for their purposes.

21  This company didn't operate under it.

22         Now, that's very different, Judge, much, much more

23  extreme, than the cases where it might not be appropriate to

24  conflate them.  So you could have a CEO who takes money,

25  commingles the money, takes some money to pay for his house

1  or something, but doesn't have anything to do with the

2  Defendant -- with the Plaintiff, and then the Plaintiff

3  sues, and there's plenty of money for the judgment.

4          So they're not prejudiced by that, and the

5  individual's ignoring of the corporate form had nothing to

6  do with anything that happened to the Plaintiff.  The Court

7  would say, "Okay.  Well, there was a violation of the

8  corporate form, but that violation of the corporate form has

9  nothing to do with what happened to the Plaintiff, so I

10  don't see an injustice there."  Right?  So there they

11  wouldn't be conflated, but, in other circumstances, they

12  are.  In other circumstances, courts find, "Okay.  Well, he

13  was taking money out, and there's not enough money."  That's

14  also unjust, right?

15          Here we have the extreme example, where these

16  individual Defendants are here saying, "Fiduciary shield.

17  We had a corporation set up.  Therefore, the only entity or

18  person these women can sue is a piece of paper that has no

19  employees, no offices, no nothing.  It's a piece of paper.

20  We, even though we ran it individually, without regard to

21  any of that, for a decade, we get to now hide behind it."

22  That is the injustice.  That is sufficient.

23          Now, we also have here, Judge, more than that.  We

24  don't need more than that, but we have more than that.  And

25  over the several rounds now, we have ping-ponged.  The

128

1  original opposition to the motion to dismiss said, "You need

2  to show insolvency."  That's just not true.  The next --

3  when they came in for the argument, and in their

4  supplemental briefs, it was "It's obviously solvent.  There

5  was this transaction."  Now I heard that has nothing to do

6  with it.  That's part of your Honor's decision, what they're

7  saying, "Well, that has nothing to do with it.  We're not

8  relying on that."  Okay.

9          But here's what we actually allege.  We allege

10  that, prior to the time of filing of the complaint, it was

11  insolvent.  It was insolvent for the following specific

12  reasons.  There's a tax issue, but, more precisely, because

13  there was $700,000,000 worth of debt on that company, that

14  it couldn't carry without the guarantee and payments of a

15  separate company, owned by the separate parties, that was

16  separated there solely for this tax issue.

17          So the MindGeek entities -- the Redwood and

18  Colbeck had security on all of it, because they knew that.

19  The MindGeek entities didn't.  So, if the loan was called on

20  MindGeek, creditors would have no ability to get to

21  MindGeek, but there would still be assets at RedTube

22  (phonetic).

23          THE COURT:  Yes, but, Mr. Bowe, that happens all

24  the time.  There's collateral all the time in loan

25  agreements, especially in gigantic loan agreements, right?

129

1            MR. BOWE:  Of course there is, Judge, but the

2  question is, in Las Palmas -- right?  In Las Palmas, this

3  issue comes up, and in Las Palmas, the Court says the fact

4  that the parent was guaranteeing the debt of subsidiary

5  creates an inference that the subsidiary was

6  undercapitalized.  That is exactly what we have here, and

7  it's not a minor debt, Judge, $700,000,000, and for the long

8  period of time, all that money was going to pay interest.

9  There was no money to go anywhere else.

10            Now, we bring this case.  All of a sudden, in the

11 middle of discovery, they do another transaction, a

12 transaction where, apparently, there's a sale at market

13 value, for $400,000,000, from the individual Defendants to

14 some entity that no one ever heard it and didn't indicate it

15 had any money.  If the value of the company was 400, and

16 that's now what they're due, they didn't get 400.  No one

17 paid them 400.  They're getting paid four -- Mr. Sack said

18 several times, quote, "Antoon and Tassillo testified they

19 got paid."  They got paid a little bit.  The hundreds of

20 millions of dollars are to come.

21            THE COURT:  I understand.

22            MR. BOWE:  And our allegation is that is a classic

23 means -- if it's worth 400, they're taking 400 out.  There's

24 not even 400 there now for someone to pay 400 for.  So,

25 after they lose 80 percent of their content, Visa and

130

1    Mastercard curtail their support.  You have a deferred

2    prosecution.  You have two class actions that get to go

3    forward.  You have these cases that have been filed.  You

4    have hundreds of other claimants who have indicated they're

5    going to file cases.  These four Defendants exit in a sale

6    which appears to be for whatever value there is and then

7    some, because it's going to be paid over time with whatever

8    the company has.

9           We allege all of that is a scheme whereby the

10   Defendants set the original structure up, and set this

11   structure up so the individuals who were personally

12   responsible for the conduct that hurt the Plaintiffs, for

13   the violations of the trafficking statute, are attempted to

14   evade the liability under the statute with -- I won't -- we

15   quote the cases.  The Ninth Circuit cases we have in our

16   brief.  I read them to you this morning.

17          If you're trying to escape statutory liability

18   personally that you have, that is -- that can be

19   inequitable, and it is a ground to pierce, and so you have

20   that, plus you have the fact that these women now -- you're

21   making an assumption, and Mr. Sack got up and he said,

22   "Well, and now there's the hundreds of millions of dollars

23   on this, a hundred" -- none of that is in the record.

24   That's all from post-discovery.  In fact, they put in

25   affidavits after the sale, for the period after the sale, on

131

1 this motion, where they said, "We have $200,000,000 in

2 revenue."  Okay.  Well, we didn't have discovery on that.

3 The other Plaintiffs didn't have discovery on that, and it

4 doesn't show anything.

5          THE COURT:  Why didn't you ask for it?

6          MR. BOWE:  Well, we did, which -- so Ms.

7 Fleites -- Ms. -- we -- they said -- they objected to any

8 discovery after 2021 by saying, as they've now said again,

9 "Our position is it's only relevant before 2021."  We said,

10 "Okay.  But we need" -- when that agreement came up in the

11 depositions, we asked for it, because we wanted to know the

12 terms.  In the deposition, I said, "Well, it at least goes

13 to conflict," right?

14          THE COURT:  Right, but then you got that.

15          MR. BOWE:  Well, we fought over it for a long

16 time.

17          THE COURT:  Right, but you got it at the end of

18 the day.

19          MR. BOWE:  We got it, and we think it's consistent

20 with our view that they are attempting to use a fictional

21 corporate form, which is our allegation that has to be

22 accepted as true here based on those detailed allegations.

23 So now this is the coup de grace.  This is how you exit and

24 you go away, and the Plaintiffs are left with an entity that

25 may or may not be solvent.

132

1          The Plaintiff isn't stuck -- if individuals use a
2    corporate form to directly harm a Plaintiff, in violation of
3    a statute or a tort, the Plaintiffs -- the owners -- not
4    that they took money separately, and they have to do with
5    the Plaintiffs.  That can be a different version, but, when
6    they're the ones responsible, and they're operating it
7    completely independent of any corporate form, the law says
8    you can go after either one, because there is no
9    separateness.
10         This is on the extreme, and the cases, when it
11   gets this extreme, say, "Look.  If there's just no real
12   corporation, it just exists on paper, and the owners are
13   operating it themselves, when they're not supposed to be
14   involved at all, and they're the ones involved in directing
15   the conduct that violates the statute, then they can be held
16   liable."  That's this case.
17         And we have a situation where the structure that
18   they had in place to begin with was set up to isolate
19   liability.  It was set up to be, basically, a bankruptcy
20   remote entity.  MindGeek would have been the entity that
21   would have had no assets.  And now they have executed a
22   transaction where the individuals are out, with, apparently,
23   all the value that's in the company.  Otherwise, it would
24   have been worth more.  And so either one of those is
25   sufficient for us to have alter ego liability.  Together,

133

1  they are definitely sufficient.

2          And so Defendants got up and said, "Well, Mr. Bowe

3  agreed they got all those materials."  It's true.  We didn't

4  say, "Well, let's wait and do all of that all over."  We

5  think that's sufficient.  But we also refused a request

6  that, in doing that, the new Defendants waive any right to

7  personal jurisdictional discovery.  We said, "No way," and

8  we didn't, and in the motions, they requested it.

9          And at the moment, what is happening with this

10 company after that transaction, not only whether they get in

11 revenues, Judge, but what if they have -- what if it was

12 another leveraged buyout, like all of them?  We have no idea

13 how much debt is on this company.  This company could have

14 another $700,000,000 of secured debt on it, plus

15 $400,000,000 to the individual Defendants.  So the

16 Plaintiffs that sued after this come in clean, and they're

17 looking at this and saying, "Well, it was insolvent then,

18 but, if it wasn't, these Defendants look like they're taking

19 out the money now," and they're entitled to discovery for

20 that.

21          And what I heard during -- Mr. Sack, in

22 particular, I mean, he was just telling you certain facts.

23 Many of them aren't in the record at all.  All these facts

24 about after 2023, it's making a lot of money now, it's doing

25 this, it's doing that, after discovery closed, those are

134

arguments, arguments about which there's no discovery and

there's no record, and I think all of this discussion goes

to show, your Honor, at the moment, at this stage of the

proceeding, it would be improper and fundamentally unfair

for you to make findings.

            THE COURT:  What are you going to ask for?

            MR. BOWE:  What are we going to ask for?

            THE COURT:  Yes.

            MR. BOWE:  We will ask for balance sheets.  We

will ask for --

            THE COURT:  You got profit and loss statements,

right?

            MR. BOWE:  We have profit and loss statements from

earlier, and we got balance sheets, but we also ended up

understanding where the leverage was, how much leverage

there was, what the debt was, and how it was structured.

            Now, that structure doesn't exist anymore.  It was

changed in this transaction.  Now, they claim it's the same

entities, but we don't know that, and they could have

attached -- so we need to know, how much debt is there?  We

need to know, how much money is the company making?  We need

to know whether the obligations to the individual Defendants

are essentially most of the value in the company.  We need

to know whether there's any plan, if these gentlemen get

out, to simply fold up the few pieces of paper that are

135

1    currently Defendants and write a new piece of paper.

2         Why, Judge, are they fighting to keep MindGeek

3    S.A.R.L. out?  That's the only place where the money and the

4    value is.  The entities, they said, "They're here and they

5    have all this money."

6         THE COURT:  Maybe.

7         MR. BOWE:  Well, no.  We have -- these are

8    allegations in our complaint, based on the evidence.

9    MindGeek is the parent.  It holds the licensing rights.  All

10   these entities are just licensees.  So they get a licensee.

11   They can be withdrawn.  They bring in revenues, and they

12   kick up royalties.  That license could be revoked and given

13   to anther piece of paper, and we're suing pieces of paper,

14   and that is -- these facts, Judge, with all due respect,

15   there's no case that any of us has cited that has facts like

16   this.

17        This is sort of -- if I was teaching a class on

18   what's the crazy, most obvious alter ego case, and what's

19   sort of the most obvious "here it comes" sort of use of the

20   corporate form to defraud people, I wouldn't even think this

21   up, but that's what it is, and counsel is here saying,

22   "Well, it's not like this case, and it's not like that case,

23   and this case."  That's true, but the law accounts for the

24   extreme, and the cases we cited, including -- I just read to

25   you the California Act, and they're citing Wilkins on

136

California law.

If an individual owner operates a company as if it doesn't have a corporation, then it's individually liable. To hold otherwise would be inequitable, because the separation had ceased. That makes complete and utter sense, and that is the law. That is what we allege. We also allege that they're using that corporate form to insulate the individuals from ever having liability, and at this stage of the proceeding, I think we've alleged more than any case that has supported this, including, your Honor -- you know, he said there's no case involving -- where alter ego is found, that didn't involve some sort of insolvency.

We cite three trafficking cases, including the Doe v. MindGeek Free Sites (phonetic) case from December of last year, on these exact facts. They raise all the same arguments, and the Alabama District Court said, "No. Alter ego." There was no -- they didn't go -- the Court didn't go into "Was it insolvent, was it not?" The question there was the same as the question is in the tax cases, in the labor cases, and in the collective bargaining cases. There's a statute. It puts a liability on you, puts it on you individually, and if you put a corporation in between, but you operate that corporation like it's you as an individual, then you can't hide behind that corporation to get past that duty.

137

1          And some of those cases involve some financial
2   shenanigans, but not insolvency.  Some don't involve any at
3   all.  There's one, one of the tax cases, the government had
4   a tax -- got a tax lien on a company, and immediately liened
5   on the individual owner's completely separate assets, and he
6   was -- he said, "Well, but I had assets here," and he said,
7   "It doesn't matter.  You were the company, so it doesn't
8   matter."

9          Where that -- where those are the facts, which is
10  different, Judge, than most of the cases -- in most of the
11  cases, the two prongs do have a distinction, as a practical
12  matter, but they don't have to, and the descriptions of the
13  rules say that, basically, and here we just don't, because
14  these three individual owners, who are supposed to be
15  removed by almost half a dozen or more than half a dozen
16  entities, and then their own entities, into UBO status, were
17  directly running this company as if they were just one
18  company.  That was Mr. Antoon's testimony, "It's just one
19  company.  I have no idea what the corporate form is."

20          They should have had nothing to do with it, and
21  they were directly responsible for what was going on with
22  the Plaintiffs.  They were directing it.  They were the
23  executives.  And under those circumstances, they are in a
24  very different situation than somebody who's taking money
25  out to pay their mortgage, but has no involvement with the

138

1  Plaintiff, and the Plaintiff gets injured some other way,

2  but there's otherwise money there.  He didn't make it

3  insolvent.  The two prongs are different there.  There was

4  commingling, but the commingling didn't hurt the Plaintiff.

5          Here, there wasn't just commingling.  There was a

6  cessation of separation, and that cessation of separation

7  meant that these individual Defendants were the parties who

8  were responsible for the statutory illegal conduct, and to

9  allow them to now escape that liability because they had a

10 paper form contract that they didn't even understand and

11 never followed would be inequitable, in addition to the fact

12 that we've alleged facts sufficient for an inference that

13 they're now also trying to use that corporate form to divert

14 the assets out of the business.

15         Your Honor, I appreciate your time and your

16 patience.  I was given a note, something about sealing,

17 there's sealing issues.  But, your Honor, thank you very

18 much for all your time and your patience on what is an

19 interesting issue.

20         THE COURT:  Yes.

21         MR. SACK:  Your Honor, given the length of Mr.

22 Bowe's last words, can I just have two minutes to --

23         THE COURT:  Sure.

24         MR. SACK:  Your Honor, just two comments.  I guess

25 first is, I come back to the point I made earlier.  Where is

139

the documents?  I would have thought that, after me standing

here before saying that, Mr. Bowe would get up and say,

"Well, your Honor, Mr. White raises this question.  Let me

show you what the documents are that show that they were

insolvent in 2023 or 2021."  I didn't hear anything about

that.

I heard 20 minutes of argument, speculation about

what things might show, but they cited no documents for

2023.  You recall I talked about how MindGeek made hundreds

of millions of dollars every year for the seven years

preceding the filing of the lawsuit in 2021.  I didn't hear

anything from them about why that was wrong, or what other

document they have that would show that those are wrong.

So, your Honor, what's happened is we've gone

from -- they say that, in discovery, we were laser focused

on 2021, so that didn't work out.  They don't have any

document for that.  Then it's 2023.  Now they don't have a

document for that.  So what's their next step?  It's "We

need" -- "Now we need discovery about 2025."  And, your

Honor, that's not necessary, for this reason.

The alter ego would -- the injustice would require

bad faith conduct by the individual Defendants that's

intended to prejudice the Plaintiffs in some way.  Our

clients were gone post-2023.  You have the sale agreements.

That marks the last day they were involved with the company.

140

1  So whatever the company's status is now can't show bad faith

2  conduct by the Defendants, these individual Defendants.

3         And keep in mind that if the remaining corporate

4  Defendant can pay a judgment, then that means there's no

5  injustice, but the reverse is not necessarily true.  So long

6  as there's no bad faith action, if a company just is

7  insolvent, they can't pay their debts for whatever reason,

8  because business is bad or any other reason, then the case

9  law is clear that Plaintiffs are just out of luck, and

10 that's not injustice under alter ego.

11        So, at best, this 2025 discovery that Mr. Bowe is

12 proposing would show that, would show, "Okay.  In the two

13 years since the individual Defendants sold their interest,

14 now the company is not doing well."  Okay.  So that doesn't

15 mean that injustice is established.  It means "Okay.  Then

16 you need to go look at whether there was bad faith conduct

17 by the individual Defendants," and they've covered all that.

18 We've gone up to 2023, and they have no documents that show

19 that.  Thank you, your Honor.

20        THE COURT:  All right.  Thank you very much.

21        All right.  I'm going to take the motions under

22 submission.  We'll issue an order as soon as possible.

23 Thank you very much.

24        THE CLERK:  All rise.

25     (Proceedings concluded.)

*Echo Reporting, Inc.*

141

1        I certify that the foregoing is a correct

2 transcript from the electronic sound recording of the

3 proceedings in the above-entitled matter.

4

5 /s/Lorraine Caldwell                    4/29/2025
  Transcriber                            Date
6

7 FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

8

9 /s/L.L. Francisco
  L.L. Francisco, President
10 Echo Reporting, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25